## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| Let Them Play MN, Jane Doe 1, both individually and as parent and guardian of Jane Doe 2 and John Roe 1, minors, Jane Doe 3, as parent and guardian of John Roe 2 and Jane Doe 4, minors, Jane Doe 5, and John Roe 3, as parent and guardian of John Roe 4, a minor.<br><br>Plaintiffs,<br><br>vs.<br><br>Governor Tim Walz, in his official capacity, Attorney General Keith Ellison, in his official capacity, Commissioner Jan Malcolm, in her official capacity, Minnesota Department of Health, Commissioner Alice Roberts-Davis, in her official capacity, and Minnesota Department of Administration,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 0:20-cv-2505<br><br><br><br>**COMPLAINT** |

Plaintiffs for their Complaint against Defendants state and allege as follows:

## <u>INTRODUCTION</u>

1.      COVID-19 has proven to be a serious and intractable public health threat, not susceptible to quick fixes or simple solutions. Young people have responded admirably to the resulting consequences and cancellations. However, Minnesota kids should not be required to accept, nor will the law allow, arbitrary and irrational burdens. Minnesota's ban on youth sports unfairly singles out young people for harm even though State officials are aware the decision lacks support in sound science or common sense.

2.     Data and scientific principles known to Minnesota leaders demonstrate that banning youth sports is certain to harm the young and is likely to **_increase_**, not reduce, the spread of COVID in Minnesota communities. Lacking substance and evidentiary support for their ban, State officials seek to avoid scrutiny by deploying scientific terms as a defensive veneer. However, this facade crumbles under only minimal scrutiny. Minnesota's youth must not be asked to bear a burden the State knows to be unnecessary.

3.     It is not without a certain irony that the same Executive Order that irrationally bars youth sports, also prohibits collective action by those who would dissent. In violation of bedrock First Amendment freedoms, Governor Walz has attempted to prohibit those who disagree with his decisions from "congregat[ing] together for a common or coordinated . . . purpose" even if such protest is entirely safe and, in his words, "even if social distancing can be maintained."

4.     Plaintiffs bring this action because "even in a pandemic, the Constitution cannot be put away and forgotten." _Roman Catholic Diocese of Brooklyn v. Cuomo_, __ U.S. __, 2020 WL 6948354, at *3 (Nov. 25, 2020) (per curium). Plaintiffs request immediate temporary and permanent injunctive relief barring Defendants from violating their constitutional rights as set forth herein.

## **PLAINTIFFS**

5.     Plaintiff Let Them Play MN ("LTP") is a Minnesota non-profit corporation. LTP was founded as an unincorporated association in August 2020 by its current Executive Director Dawn Gillman. As a mom of high school athletes, Ms. Gillman founded LTP because she believed it was unfair to prohibit certain sports from playing when, in fact, it

2

was safe to let them play. Over the four months since its founding, LTP has organized more than 23,000 supporters, including parents, coaches, and fans from across Minnesota who understand the value of participation in youth sports and activities.

6.      LTP exists to overcome obstacles and enable Minnesota youth to safely participate in sports and other healthy activities. LTP promotes youth participation in athletics and activities by educating and providing resources for parents, educators, coaches, and the public related to: (1) the benefits of youth activities for physical and mental health; (2) accurate scientific evidence regarding youth participation in activities; (3) best practices for safe participation; and (4) overcoming potential obstacles to participation.

7.      Jane Doe 1 ("Doe 1") has coached high school sports for five years. She coaches cross country, Nordic skiing, and track and field for a high school in the Twin Cities Metro Area. During the fall 2020 cross country season, to Doe 1's knowledge, none of her athletes, no other coaches, and none of her opponents contracted COVID. No other teams had to cancel competitions or had any need to quarantine. During the cross-country season, Doe 1 found it easy for her runners to maintain social distancing and to safely participate.

8.      It is difficult for Doe 1 to understand why Executive Order 20-99 (the "Order") allows outdoor running and Nordic skiing *unless* that running or skiing is done as part of a youth sports team or school program. Governor Walz even encouraged Minnesotans to get outside and exercise (including skiing) after he issued the Order. But

somehow young people in Minnesota and their coaches are not able to safely do just that, using the same protocols used to safely train and compete during the fall sports season.

9.      Jane Doe 2 is a junior at a public high school in the Twin Cities Metro Area. She began lifting weights when she was 11 and participates in her school's Olympic weightlifting club. She loves the sport and has been state champion for three years. She has placed in the top 3 national competition. Doe 2 wants to continue lifting in college and sees the Olympics as a possibility, if she is allowed to train. Doe 2 wants gyms and schools to open so she can have something productive to do with her time.

10.     Like other high school kids, Doe 2 spends time with friends her age when she is not busy with school and athletics. School is now closed, and Doe 2 is not able to lift weights except at home. Doe 2 has noticed that shutting down school and sports has only given kids her age more free time that they use to spend together, hanging out or shopping. Kids her age are bored and tired of being isolated during this long, difficult year.

11.     In Doe 2's experience, High school kids are not overly concerned about COVID because there is no risk to them. To be clear, Doe 2 socially distances and avoids crowds like retail shopping even though she is allowed to shop. The only close contact Doe 2 has had with COVID-19, to her knowledge, is from an aunt who Doe 2 spent time with earlier in the year. After that contact, Doe 2 quarantined for two weeks, but ultimately tested negative for COVID.

12.     John Roe 1 ("Roe 1") is a high school swimmer who has competed and would be practicing and competing on the swim team of a public high school in the Twin Cities Metro area if the Order had not shut down swimming in Minnesota. Earlier this year, pools

were closed and Roe 1 had to swim in a lake. This did not make sense to Roe 1 since COVID-19 does not spread in chlorinated pools.

13.     Roe 1 was at the top of his age group in his best swimming event, heading into the state meet in March 2020. However, that meet was shut down when swimmers were already at the venue. Now that swimming was shut down again by the Order, Roe 1 travelled to another state where youth athletes are allowed to play and where Roe 1 has a relative. Even though he is sleeping on the floor of an apartment, Roe 1 is thankful to have the option to train. Many kids could not travel and kids in Minnesota are not allowed to train at all even though swimming is safe and thousands of swimmers practiced and competed this year, once they were allowed to do so in late summer and fall.

14.     Roe 1 is still able to distance learn even though he is outside of Minnesota. Roe 1 is thankful to swim for many reasons, including that it helps to diminish his symptoms from attention deficit disorder. By continuing to train outside of Minnesota, Roe 1 is better able to learn through distance learning.

15.     John Roe 2 ("Roe 2") is ten years old. He is autistic. Club gymnastics has been a godsend for Roe 2 and his family. For the past 2 years, he has participated in gymnastics roughly 12-14 hours per week at a private gym in the Western Suburbs of the Twin Cities. Gymnastics has helped Roe 2 learn how to interact with those around him and improve other social skills. To his family's knowledge, there have been no positive cases of COVID at Roe 2's gym. The gym has adopted, and Roe 2 has followed, strict protocols that prevent the spread of COVID.

16.     Shutting down the gym hurts Roe 2. His family can see his pain and the frustration he feels because he cannot go to the gym. Roe has clearly been more irritable since the Order closed his gym. Roe 2 has a hard time understanding why he cannot practice at the gym he loves and knows is safe and healthy when his school is open and he can attend to school full time.

17.     Jane Doe 4 ("Doe 4") is 12 years old and loves club gymnastics. Doe 4 battles anxiety and gymnastics is therapeutic for her. Shutting down sports and gyms has made Doe 4's anxiety worse and causes her to slip into depression. Doe 4 was finally getting back to normal from the last shut down earlier in 2020 when the Order was issued that banned gymnastics. She just wants to get back to the gym and continue to safely practice. Doe 4 follows her gym's strict protocols that have been in place all year. She cannot understand why the State prohibits kids from participating in sports.

18.     Jane Doe 5 ("Doe 5") is a youth archery coach. Archery is a safe and healthy activity in which youth participants learn about discipline, goal setting, and problem solving. Doe 5 is involved in several archery organizations and has traveled outside of Minnesota several times this year. To Doe 5's knowledge, no one associated with these groups or competitions has contracted COVID-19 and the virus has not been transmitted through archery.

19.     Throughout 2020, archery organizations have adopted and carefully followed protocols that allow the sport to continue without any difficulty or danger. Yet, the Order bans kids from practicing or competing in archery with or without protocols. It is difficult for Doe 5 to understand why kids cannot continue to safely practice and compete in archery,

while kids are free to go to big-box stores and the Mall of America. Kids may even shop with their friends in an archery store, but they cannot stand six feet apart at a youth archery competition with the equipment they purchased. Doe 5 does not believe this is rational or fair.

20.     John Roe 4 ("Roe 4") is eleven years old and in sixth grade. He lives in rural, South-Central Minnesota. Roe 4 is a wrestler and 2020-21 would be his seventh season if he is allowed to wrestle.

21.     Roe 4 has had a very difficult year in 2020. After being one of the few fifth graders at his weight who qualified to compete in the Minnesota USA State Tournament, he was unable to wrestle in the Northland Youth Wrestling Association season due to COVID-19.

22.     In the off-season, Roe 4's mother passed away after a long battle with cancer. Wrestling means the world to Roe 4, his brother, to their dad, and to their mom before she died. In a very hard year, Roe 4 looked forward to wrestling beginning in November even more than he had in years past. However, wrestling was banned by the Order after Roe 4 had only five practices. He has a legitimate chance at winning a youth wrestling title in his weight class during his last season in youth if he is allowed to wrestle and tournaments are scheduled. Roe 4 had promised his mother he would do anything to win before she passed. Now he is unsure if or when he will be able to wrestle at all, and only one high school tournament has been scheduled in Minnesota even if wrestling is allowed to resume. School has not helped to improve Roe 4's year. His school is distance-learning which has made learning more lonely and more difficult.

23.     Roe 4 is not surprised that there have not been outbreaks in wrestling. Wrestlers had medical checks and other precautions in place for years before COVID-19 and have always had a small number of wrestlers with whom they have contact. During practice, wrestlers are only in close contact with one or two wrestling partners who remain the same. Meets are closely tracked, socially distanced, and careful contact tracing is easily and immediately available.

24.     Each of the Plaintiffs is participating in this lawsuit so that all Minnesota kids can return to healthy and safe participation in sports and activities as soon as possible.

## **DEFENDANTS**

25.     Defendant Governor Tim Walz is a party in his official capacity as Governor of the State of Minnesota. Governor Walz issued the Order.

26.     Attorney General Keith Ellison is a party in his official capacity as Attorney General of the State of Minnesota. Attorney General Ellison is tasked with and has enforced the Order.

27.     The Minnesota Department of Health ("MDH") has collected and analyzed data and otherwise contributed to the Order and the State's response to COVID-19.

28.     Commissioner Jan Malcolm is a party in her official capacity as Commissioner of MDH.

29.     The Minnesota Department of Administration ("MDA") is responsible for the safety, operation, and administration of certain buildings owned or operated by the State of Minnesota, including the grounds of the Minnesota State Capitol.

30.     Commissioner Alice Roberts-Davis is a party in her official capacity as Commissioner of MDA.

31.     All acts of Defendants and their officers, agents, servants, employees, or persons acting at their behest or direction set forth herein, were done and are continuing to be done under the color and pretense of state law and pursuant to Defendants' policies, practices and/or customs.

## JURISDICTION AND VENUE

32.     This Court has personal jurisdiction over Defendants.

33.     The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331, as this action arises under: (a) the First and Fourteenth Amendments to the United States Constitution; (b) 28 U.S.C. § 1343(a)(3), as it is brought to redress deprivations, under color of state law, of rights, privileges, and immunities secured by the United States Constitution; (c) 42 U.S.C. § 1983, which provides a cause of action for the protection of civil rights; (d) 42 U.S.C. § 1988(b), as it seeks an award of attorneys' fees; (e) 28 U.S.C. § 2201(a), as it seeks to secure declaratory relief; and (f) under 28 U.S.C. § 2202, as it seeks to secure permanent injunctive relief. This Court has supplemental subject matter jurisdiction over the state law claims in this case under 28 U.S.C. § 1367.

34.     Venue is proper in the United States District Court for the District of Minnesota under 28 U.S.C. § 1391(b), as all or a substantial part of the events giving rise to the claims occurred within the District.

## THE BENEFICIAL EFFECTS OF YOUTH SPORTS AND ACTIVITIES

35.    Participation in organized youth sports and other activities is safe and healthy and promotes the physical and mental health of Minnesota youth.

36.    According to the American Academy of Pediatrics:

> It has been well documented that sports involvement has an overall positive effect on mental health in kids of all ages. Relative to other activities, sports help develop emotional regulation, and both parents and kids report that better emotional control and exploration are benefits of athletics. Athletes report higher scores on mental health scales, and teenagers participating in organized sports report fewer mental health problems and have lower odds of emotional distress compared with peers. Members of sports clubs show greater stress resistance and have a lower prevalence of psychosomatic symptoms. Sports have been inversely associated with depression in athletes, and fewer depressive symptoms and higher confidence and competence are some of the most commonly associated positive outcomes of participation. More athletic adolescents appear better adjusted, feel less nervous and anxious, and are more often full of energy and happy about life. Athletes also feel sad, depressed, or desperate less often than those less involved in sports. The protective effect of sports on mental health is further indicated by the fact that children who drop out of organized sports may experience greater psychological difficulties and social and emotional problems. Sports participation may have a lasting effect on mental health, as well. Involvement in school sports during adolescence is an associated predictor of lower depression symptoms, lower perceived stress, and higher self-rated mental health in young adults.

> The beneficial effect of sports on mental health and depression applies to suicide, as well. After controlling for physical activity, team sports protect against feelings of hopelessness and suicidality, and organized sports participation is associated with a lower likelihood of suicidal behavior. . . .

Kelsey Logan, MD, MPH, FAAP, Steven Cuff, MD, Council on Sports Medicine and Fitness, *Organized Sports for Children, Preadolescents, and Adolescents*, 143 Pediatrics 6 (June 2019) (citations omitted) a*vailable at* https://pediatrics.aappublications.org/content/pediatrics/143/6/e20190997.full.pdf

37.     According to a 2019 report issued by the U.S. Department of Health and Human Services, "The benefits for youth who engage in regular physical activity are clear: they have improved bone health, weight status, cardiorespiratory and muscular fitness, cardiometabolic health, and cognitive function and a reduced risk of depression." U.S. Department of Health and Human Services, *National Youth Sports Strategy* 11 (2019), *available at* https://health.gov/sites/default/files/2019-10/National_Youth_Sports_Strategy.pdf.

38.     President Barrack Obama's Council on Fitness, Sports & Nutrition (the "President's Council") issued a report highlighting the importance of youth sports as to combat decreasing youth activity levels in America, citing several studies showing the value of sports and youth. U.S. Department of Health and Human Services, *Physical Activity Guidelines for Americans Midcourse Report: Strategies to Increase Physical Activity Among Youth.* (2012), *available at* https://health.gov/sites/default/files/2019-09/pag-mid-course-report-final.pdf. This report found:

> Despite the importance of regular physical activity in promoting lifelong health and well-being, current evidence shows that levels of physical activity among youth remain low, and that levels of physical activity decline dramatically during adolescence.

*Id.* at 1.

39.     In January 2015, the President's Council partnered with the Aspen Institute to issue *Sports for All, Play for Life: A Playbook to Get Every Kid in the Game*, a report offering strategies to promote meaningful, accessible and safe options for all youth to participate in sports due to the many benefits of youth sports.

40.    According to MDH, "Children and teens ages 6 to 17 should get at least 60 minutes of physical activity every day, with muscle- and bone-strengthening activities at least three days a week." https://www.health.state.mn.us/communities/physicalactivity/pa basics.html

41.    During the period in which the 2019 novel coronavirus has been a threat ("COVID-19" or "COVID") pandemic, MDH Commissioner Jan Malcom explained, "It is important that we look for opportunities to allow children to engage in activities that promote health and well-being" and that she is "well aware of the importance of youth sports to . . . student athletes and the broader community."

42.    Minnesota courts have recognized the value of athletics in the development of the child. *Thompson v. Barnes*, 200 N.W.2d 921, 926 n. 11 (Minn. 1972) (stating that "participation in interscholastic activities . . . is today recognized . . . as an important and integral facet of the youth's education process.").

43.    Governor Walz has recognized the value of youth sports, stating: "The well-rounded student has these extracurricular activities, whether they be football, concert band, speech and debate, volleyball. And to try and get our students back into them — if we can do it safely with what we know now — we should try to do so."

## YOUTH MENTAL HEALTH IN 2020

44.    Numerous sources have raised significant concerns regarding stress and challenges for youth in 2020. According to a Centers for Disease Control and Prevention ("CDC") report issued on October 17, 2020:

Emergency departments (EDs) are often the first point of care for children's mental health emergencies. U.S. ED visits for persons of all ages declined during the early COVID-19 pandemic (March–April 2020). . . . Beginning in April 2020, the proportion of children's mental health–related ED visits among all pediatric ED visits increased and remained elevated through October. Compared with 2019, the proportion of mental health–related visits for children aged 5–11 and 12–17 years increased approximately 24% and 31%, respectively.

***

Children's mental health during public health emergencies can have both short- and long-term consequences to their overall health and well-being. . . . CDC supports efforts to promote the emotional well-being of children and families and provides developmentally appropriate resources for families to reduce stressors that might contribute to children's mental health–related ED visits.

https://www.cdc.gov/mmwr/volumes/69/wr/mm6945a3.htm

45. A *COVID-19 Parental Resources Kit* for parents published by the CDC describes numerous challenges for young people in 2020, including:

School closures due to COVID-19 have meant that adolescents have been participating in learning from home. . . . School closures have also meant a break in access to some essential developmental services like occupational, behavioral, or speech therapy. It could also have impeded continuity in adolescents' development of athletic or hands-on vocational skills, with potential impacts on their higher education and professional future.
***
Physical distancing can feel as if one is placing life on hold. . . Social distancing, stay-at-home orders and limits to gatherings have affected their ability to gather in person with friends and family to celebrate or grieve in typical ways. Grief is a normal response to losing someone or something important to you. It is important for family and friends to help adolescents find alternate, creative and safe ways to connect and support each other at a distance.

https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/parental-resource-kit/adolescence.html

46.    According to the MDH:

Drug overdose deaths increased 31% during the first half of 2020 as compared to the first half of 2019, according to new statewide data released by the Minnesota Department of Health (MDH). The first half of 2019 (January to June) showed 373 deaths while the first half of 2020 showed 490 deaths.

Overdose deaths in 2020 started to increase sharply in March . . . .

https://www.health.state.mn.us/news/pressrel/2020/overdose120320.html

47.    Mental Health America ("MHA")—a national nonprofit dedicated to addressing mental illness and promoting mental health—recently summarized mental health screening results from January to September 2020 for 1,560,288 individuals across the United States who used MHA's online mental health screening tool. Among other findings, the organization found:

- "The number of people looking for help with anxiety and depression has skyrocketed."

- "The number of people screening with moderate to severe symptoms of depression and anxiety has continued to increase throughout 2020 and remains higher than rates prior to COVID-19."

- "More people are reporting frequent thoughts of suicide and self-harm than have ever been recorded in the MHA Screening program since its launch in 2014."

- "Young people are struggling most with their mental health. . . . throughout the COVID-19 pandemic youth ages 11-17 have been more likely than any other age group to score for moderate to severe symptoms of anxiety and depression."

- "In September 2020, over half of 11-17-year-olds reported having thoughts of suicide or self-harm more than half or nearly every day of the previous two weeks."

## MINNESOTA'S RESPONSE TO COVID-19
## AND EXECUTIVE ORDER 20-99

48.     Governor Walz and Minnesota's executive agencies have taken numerous actions in 2020 seeking response COVID-19, particularly through Governor Walz's Executive Orders.

49.     Among other Executive Orders, on November 18, 2020, Governor Walz issued the Order. A true and correct copy of the Order is attached hereto as Exhibit A.

50.     In issuing the Order, Governor Walz relied on information, data, and advice from the MDH, among other agencies and sources.

51.     Among other mandates, the Order required certain facilities and organizations to close or cease operations that Plaintiffs have used and desire to use, including requiring that:

- "Public pools, as defined in Minnesota Statutes 2020, Section 144.1222, subdivision 4(d), are closed to ingress, egress, use, and occupancy." Order § 7.c.iii.B.

- "Gymnasiums, fitness centers, recreation centers, indoor sports facilities, indoor climbing facilities, trampoline parks, indoor and outdoor exercise facilities, martial arts facilities, and dance and exercise studios are closed to ingress, egress, use, and occupancy by members of the public." *Id*. § 7.c.iii.C.

- "Organized Youth Sports. Organized Youth Sports organizations and programs must stop all in-person activities—including practices, group workouts, games, and tournaments." *Id*. § 7.g.

52.     The Order defined "Organized Youth Sports" that were prohibited as:

any sports activity, where participants are children or adolescents, organized by an entity, association, club, or organization providing for registration of participants and oversight on a regular basis for a defined period of time. Sports activities within this definition include

all sports offered by schools (public and nonpublic), the Minnesota State High School League, or similar organizations, as well as dance, cheerleading, and other sports traditionally offered by supplemental associations or organizations.

*Id*. § 7.g.

53.     While the Order banned youth sports, the Order specifically allowed other athletics and activities to continue. Among other activities, the Order allows the following activities to continue:

- "Physical education instruction that meets academic requirements as part of the school day." *Id*. § 7.g.ii.B.

- "Professional sports, meaning sports in which the athletes receive non-de minimis payment for performance." *Id*. § 7.h.ii.B.

- "Any collegiate or university institution team or athlete participating in intercollegiate athletics, provided that the team or athlete follows guidance for sports activities as listed in Recommendations for Different Levels of COVID-19 Transmission Among Higher Education Institutions, available at MDH's Institutes of Higher Education website (https://www.health.state.mn.us/diseases/coronavirus/schools/ihe.html)." *Id*. § 7.h.ii.C.

54.     The Order did not allow any youth sport or youth sports program to operate, even if any team or athlete followed guidance for sports activities as listed in Recommendations for Different Levels of COVID-19 Transmission Among Higher Education Institutions, or any other guidance or protocols.

55.     The Order allowed numerous categories of non-essential commercial services to continue, including: tanning establishments, body art establishments, tattoo parlors, piercing parlors, spas, salons, nail salons, cosmetology salons, esthetician salons, advanced practice esthetician salons, and eyelash salons. The Order only required that

occupancy for such establishments "must not exceed 50 percent of the normal occupant capacity as determined by the fire marshal, with a maximum of 250 people in a single self-contained space."

56.     The Order did not close or limit retail establishments—whether selling Christmas ornaments or comic books. Nor did it change limitations on large shopping complexes, such as the Mall of America.

57.     The Order does not attempt to regulate tribal lands in Minnesota and allows youth activities and sports to continue, uninterrupted, on tribal lands.

58.     To justify the continuation of such non-essential businesses, the Order found that further restrictions on businesses are unnecessary because:

> MDH case numbers show that extending this dial back to certain settings and businesses is not necessary at this time. For example, we see relatively fewer outbreaks in retail settings, which generally involve brief, masked, transient interactions that pose lower transmission risk. According to the CDC, an individual is not considered a "close contact" of someone with COVID-19 unless they were within 6 feet of the individual for 15 or more minutes. These extended interactions can be limited in retail environments, and MDH will provide further guidance on how to do so.
>
> Outbreaks and cases traced to personal care establishments have also been minimal since those establishments reopened. Personal care typically involves one-on-one interactions (as opposed to interactions with multiple persons) and healthcare-like precautions (like the requirement to wear a face shield over a face covering in many situations), reducing the need to restrict these settings during this dial back.

Order p. 3.

## RELEVANT MDH DATA AND METHODOLOGY

59.     Available information demonstrates that the Order's ban on youth sports was not based on data or science. Rather, the ban appears to be premised on incomplete data generated by selected and applying a different data-collection methodology and different and misleading definitions to youth sports than are applied to other activities.

60.     Among other concerns, the Order inexplicably singles out collegiate and professional sports for favored treatment and relaxed criteria in comparison to youth sports.

61.     Leading up to the Order, Governor Walz stated that "18-35 year olds make up a disproportionate number of cases . . ." and that the Order would be designed to "target" locations where "18 and 35 year olds [are] congregating together . . . ."

62.      Professional and collegiate athletes generally fall between 18 and 35 years old. Proving Governor Walz's point, during a period of less than two weeks beginning one day after the Order was issued, the Minnesota Gopher football program had 49 positive cases of COVID-19, including 23 student-athletes and 26 staff who tested positive for COVID.

63.     Despite this, college and professional athletes were and remain the only Minnesota athletes the Order allows to play. Collegiate athletes in particular are allowed to follow a weekly testing protocol, an accommodation that was not offered to youth sports.

64.     LTP and others were particularly concerned about the inconsistencies in the Order and its apparent lack of scientific support after LTP's experience in August and September 2020 related to high school football and volleyball.

18

65.     On August 4, 2020 Governor Walz was quoted as saying the Minnesota State High School League ("MSHSL") should consider "the best science, the best data that's out there and then the high school league and [high school] athletic directors will determine [what sports to play]. It is our goal again to use that best data . . . ." He admitted, however, that MDH Commissioner Malcolm "would tell you we have not seen a high transmission amongst those playing [sports over the summer], and I think that will impact their decision."

66.     Despite this rhetoric and known data, MDH officials had informed MSHSL leaders on August 3 that MDH might intervene if the MSHSL moved forward and allowed football and volleyball to play. When MDH's intervention was noted publicly, MDH promptly changed its guidance to the MSHSL.

67.     The Order's and MDH's use of "data" related to youth sports in 2020 is equally concerning. To justify the Order's ban on youth sports, the Order stated that Minnesota has had "192 outbreaks connected to sports," that this metric is "too concerning to let these activities continue," and that "[s]ports-related cases are nearly twice as prevalent among high school-age children as any other age group, and they increasingly play a key role in the need to move schools to distance learning."

68.     It is unclear what the Order means by the term "outbreaks connected to sports." As to its first word, MDH has used several different definitions of "outbreak" in different contexts and has not explained which definition it uses in regard to COVID-19. The definitions of "outbreak" applied by MDH include, at times, just one individual testing positive for COVID test and even when more than one positive test is required, it appears

MDH does not require evidence that the setting of the "outbreak" has any bearing on how any two positive cases were contracted.

69.     For example, MDH lists a general definition of "outbreak" on its website as meaning "an incident in which two or more persons experience a similar illness after a common exposure." It does not appear that MDH applies this definition to COVID-19.

70.     In regard to influenza in schools, MDH has published at least two definitions of "outbreak," including (a) "a school [with] a double absentee rate with all of the . . . primary [influenza] symptoms . . . ;" and (b) "when the number of students absent with [influenza-like illness ("ILI")] reaches 5% of total enrollment or three or more students with   ILI   are   absent   from   the   same   elementary   classroom." *See* www.health.state.mn.us/diseases/reportable/dcn/sum97/9807dcn.pdf and https://www.health.stat e.mn.us/diseases/flu/stats/2019summary.pdf

71.     In regard to COVID-19, MDH has described an "active outbreak [as] meaning that [a nursing home has] had a [single] case in the past 14 days . . . ."

72.     Media and similar reports indicate that MDH defines an "outbreak" as "7 or more cases at an establishment" over an unknown period of time or as "7 or more cases who report visiting a given location within a 30-day window"—even if each person visited days apart and was never near any other seven persons—or "a pretty high threshold (five cases from five different households) to say there was likely transmission occurring at this place."

73.     Based on this conflicting information and MDH's failure to publish its definition of "outbreaks related to sports" it appears that MDH may be arbitrarily picking

and choosing definitions of outbreak to suit the outcome it desires to find, or at least without any rational connection to scientific method.

74.     Based on the foregoing and upon information and belief, the Order's use of "outbreaks connected to sports" is the same definition as used by MDH and means one or more individuals who test positive for COVID-19 during a fourteen-day period that have listed an activity or event during contact tracing investigations that MDH categorizes as "sports." In other words, when the Order or MDH uses the term "outbreak" in relation to sports, it could be read to mean remote possibility of one or more transmission, but does not mean that even a single transmission occurred as a result of or related to the particular "sports" event or a particular team, and does not mean that any player-to-player transmission has occurred.

75.     Using this methodology, if a Hutchinson High School football player who played in an away game at Rocori High School on November 12 and a fan from Grand Rapids who drove down to watch a game at Rocori on November 20, both tested positive for COVID-19 on November 22, MDH would classify Rocori High School as having an "outbreak" of COVID-19 even if it was obvious that both the Hutchison player and the Grand Rapids fan had contracted COVID at two different retail stores 190 miles apart and no one affiliated with Rocori contracted COVID.

76.     By contrast, if these two individuals visited the same gas station using adjoining pumps simultaneously or checked out in line with the same cashier at a local big-box retail store, MDH's published data, practices, and communications to date indicate that MDH would not consider this person-to-person transmission to be an "outbreak."

77.     Similar to the ambiguity of "outbreak" it has been unclear what the Order means by "connected to sports." The MDH has used the phrases "cases associated with sports" or "sports-related cases" when officials have discussed potential risks of COVID-19 from playing sports.

78.     At an October 26 media briefing, Kris Ehresmann, Director of MDH's Infectious Disease Epidemiology, Prevention, and Control Division, discussed "3,410 cases [of COVID-19] associated with sports and focusing on the high school athlete age 593 cases if you take that down to the middle school we add 309 cases . . . ."

79.     Data provided by MDH to the Minnesota Amateur Sports Commission ("MASC") of "COVID-19 Sports-Related Case" through October 24 with similar data to that quoted by Director Ehresmann showed that "Sports-Related Cases" means "Cases with Sports Activities Listed" by the individual during contact tracing. A true and correct copy of MASC's PowerPoint Presentation showing MDH's data in two charts near its conclusion is attached hereto as Exhibit B.

80.     Simply listing sports activities on a contact tracing form, of course, is at most a correlation, and does indicate that any case of COVID-19 was "sports-related" or "associated with sports" any more than these same individuals visiting the same large retail store—which many, no doubt, have—would indicate the same cases were "retail related." State officials appear to know that the Order's and MDH's use of the labels "sports-related," "associated with sports," and "outbreak" have no actually epidemiological support and require no evidence sufficient to declare alleged connection to youth sports.

81.     Information MDH provided to MASC showed that through October 24, there had been minimal cases of COVID-19 associated with sports in 2020. For example, the information showed the following number of allegedly "confirmed outbreaks" related to youth sports:

| MDH Alleged "Confirmed Sports Outbreaks" through week ending October 24, 2020 | | | | |
|---|---|---|---|---|
| Sport | Elementary School Based | Middle School Based | High School Based | Total |
| Baseball | 0 | 1 | 1 | **2** |
| Basketball | 0 | 0 | 12 | **12** |
| Cheer | 0 | 0 | 1 | **1** |
| Cross Country | 0 | 0 | 2 | **2** |
| Dance | 1 | 0 | 3 | **4** |
| Football | 0 | 2 | 8 | **10** |
| Golf | 0 | 0 | 0 | **0** |
| Gymnastics | 0 | 1 | 0 | **1** |
| Hockey | 0 | 0 | 8 | **8** |
| Lacrosse | 0 | 0 | 1 | **1** |
| Multiple | 0 | 0 | 1 | **1** |
| Soccer | 0 | 0 | 9 | **9** |
| Swimming | 0 | 0 | 0 | **0** |
| Tennis | 0 | 0 | 1 | **1** |
| Track & Field | 0 | 0 | 0 | **0** |
| Volleyball | 0 | 0 | 11 | **11** |
| Weight Training | 0 | 0 | 3 | **3** |
| Wrestling | 0 | 0 | 0 | **0** |
| **Total:** | 1 | 4 | 61 | **66** |

82.     These numbers, particularly read with MDH's apparent definitions, do not show any material risk of COVID-19 transmission related to sports, particularly if MDH had stepped back and considered that hundreds of thousands of Minnesota kids have participated in youth sports in 2020.

83.     Applying the same logic applied by MDH to sports, to retail commerce, every hour, of every day an outbreak is likely occurring at big-box retailers and gas stations in Minnesota simply because some (unclear, undefined) number of people visited the location within some (unclear, undefined) period of time.

84.     The Order's statement that officials "see relatively fewer outbreaks in retail settings" is not a summary of data, it is a summation of MDH's policy choice not to look for "outbreaks."

85.     It is irrational for MDH and the Order to apply obviously different standards and methodology to the collection of data for "outbreaks" allegedly related to youth sports than are applied in other settings and activities.

86.     The Order is further undermined by scientific studies conducted during the pandemic that demonstrate that playing youth sports is better for kids, better for their communities and results in less transmission of COVID-10 than if sports are cancelled. playing sports.

87.     Attached hereto as Exhibit C is a true and correct copy of a published summary of a University of Wisconsin study that evaluated athletes 207 schools that restarted fall sports in September 2020. Those schools represented more than 30,000 athletes, more than 16,000 practices and more than 4,000 games. Andrew Watson, MD, *COVID-19 in Wisconsin High School Athletics: Study Summary*, available at https://www.wiaawi.org/Portals/0/PDF/Health/Covid/WI_HS_SportCOVID-19.pdf.

88.     No sports were found to have a higher incidence of COVID-19 in their participants than similarly situated students matched by age. *Id.* at 3 ("In fact, no specific

sport had a statistically higher incidence rate than the background incidence among adolescents across the state during the same time period.").

89.   Of the 209 athletes who knew where they contracted the virus, only one case was attributed to participation in sports. *Id.* at 2. The vast majority of cases were contacted in their household (55.0%), or in their community (not sport or school) (40.7%). *Id.* at 2.

90.   The study concluded that "participation in sports is not associated with an increased risk of COVID-19 among Wisconsin high school student-athletes." *Id.* at 3.

91.   This conclusion aligns with other conclusions that find that participation in youth sports reduces the risk of COVID-19 relative the similar broader community. Andrew Watson, *COVID-19 in Youth Soccer Study: Executive Summary*, *available at* https://www.wiaawi.org/Portals/0/PDF/Health/Covid/WI_HS_SportCOVID-19.pdf.

92.   That study found that among youth soccer players sampled, the COVID-19 rate was 310 cases of COVID-19 per 100,000 children. *Id.* at 2. They compared this to matched date from the American Academy of Pediatrics, stating that "during the 10 weeks prior to the survey (6/18/2020 through 8/27/2020) the nationwide case rate among children in the United States was 477 cases per 100,000 children." *Id.* Again, the case rate among athletes in organized sports is less than youth in the population at large.

93.   When the Governor allowed sports to resume in June 2020, youth sports organizations were required to put in place strict protocols that limit players exposure to COVID-19. Minnesota Dept. of Health, *COVID-19 Sports Guidance for Youth and Adults* (June 18, 2020), *available at* https://web.archive.org/web/20200630023021/https://www.

health.state.mn.us/diseases/coronavirus/sportsguide.pdf. Organization's guidance is compressive and precisely prescribes how youth sports participants are to act. *See, e.g.*, Edina Hockey Association, *COVID-19 Preparedness Plan for Edina Hockey Association* (Nov 11, 2020) (requiring players arrive no more than 7 minutes before the scheduled event time and arrive fully dressed in hockey equipment); *see also Minnesota Hockey Return To Play Guidelines* (Oct. 19, 2020) (requiring association specific COVID-19 plans); Minnesota Hockey, *Association Guidelines for Managing Confirmed COVID-19 Cases* (Oct. 21, 2020).

94.     Youth's actions when they are involved in organized sports are highly regulated by thorough guidelines to reduce the risk of COVID-19 transmission and the data provided by MDH shows that they are working.

## THE ORDER'S PROHIBITION ON OUTDOOR POLITICAL AND OTHER EXPRESSIVE GATHERINGS

95.     In anticipation of the Governor's ban on youth sports, LTP was concerned that the alleged data being discussed by Governor Walz and MDH related to sports were not accurate and there was no rational reason to ban youth sports.

96.     LTP began to plan and organize a safe and peaceful political protest event in response. To ensure that there was ample room to socially distance, LTP planned to obtain a permit from MDA and to hold its event outdoors on the capitol mall, an 18-acre green space in front of the Capitol commonly used to host rallies. A true and correct copy of photographs posted by MDA showing the area for which LTP intended to obtain a permit are attached hereto as Exhibit D.

97.     LTP identified potential speakers, including coaches and individuals playing youth sports. LTP intended to discuss why the Governor Walz had made an enormous mistake in banning youth sports, why it was not supported by data and science, and why the ban should be reversed.

98.     On November 19, LTP requested a permit from MDA to hold a rally on the steps and upper lawn of Minnesota's Capitol on November 28 or December 12, 2020, from 12-1 PM.

99.     On November 19, 2020, the MDA denied LTP's request for a permit.

100.    MDA's communication of its denial of the permit stated, "The Capitol Complex is not available for events or gatherings from Saturday, November 21, 2020 through Friday, December 18, 2020 per Governor Walz order." MDA offered no alternative location or time or manner for holding a rally at the State Capitol.

101.    The Governor's order bans social gatherings defined as:

> Social gatherings are groups of individuals, who are not members of the same household, congregated together for a common or coordinated social, community, or leisure purpose—even if social distancing can be maintained. This prohibition includes indoor and outdoor gatherings, planned and spontaneous gatherings, and public and private gatherings. Organizers of prohibited social gatherings may be subject to appropriate enforcement action by city, county, and/or state authorities pursuant to paragraph 10 of this Executive Order.

Order § 6.a.

102.    Section 10 of the Order imposes a fine of up to $1,000 and 90 days in jail for an individual that willfully violates this order.

103.    The Order forecloses any assembly to protest or otherwise speak and communicate ideas about the value of youth sports and the impact of the Governor's you sports ban.

104.    The Order does not differentiate between social gatherings that are not expressive and those that are protected speech, expression, or assembly, such as collective political dissent. Nor does the Order explain why indoor shopping—not expressive conduct—is allowed, even if thousands are presented indoors at a large store, while even a small, socially distanced gathering, protest or other expressive conduct and assembly is prohibited.

105.    All acts set forth herein of Defendants, its officers, agents, servants, employees, or persons acting at its behest or direction, were done, and are continuing to be done under the color and pretense of State law. Said acts include, without limitation, the enactment, implementation and enforcement of the Order and the denial or the denial of LTP's requested permit.

106.    Defendants' actions have caused, and will continue to cause, Plaintiffs to suffer irreparable injury.

107.    Plaintiffs have no adequate remedy at law to correct the continuing deprivations of their rights.

## CLAIMS FOR RELIEF

### COUNT I
**(Against All Defendants)**
**VIOLATION OF LTP'S RIGHTS TO FREEDOM OF SPEECH AND
ASSEMBLY AS GUARANTEED BY THE FIRST AMENDMENT
TO THE UNITED STATES CONSTITUTION**

108.    Plaintiffs incorporate by reference each and every preceding paragraph of this Complaint and reallege the same as if fully set forth herein.

109.    LTP and Plaintiffs were and are prevented by the Order from

110.    The Order unlawfully limits LTP's and its leaders' and supporters' right to safely and peacefully assemble and speak, including in protest against the Order's disfavored and irrational treatment of youth athletes.

111.    The Order prohibits peaceful assembly and speech purportedly due to advance the legitimate interest of preventing the spread of COVID-19.

112.    The Order favors and allows numerous categories of indoor commercial activities and other activities known to create a far greater risk of spreading COVID-19 than socially distanced peaceful assembly or other expressive conduct.

113.    The Order does not allow any socially distanced peaceful assembly or other expressive conduct other than religious worship.

114.    The Order is not a lawful time, place, or manner regulation, as it is not narrowly tailored to serve a significant government interest and does not leave open ample alternative channels for communication.

115.    Defendants are responsible for issuance and/or enforcement of the Order.

116.    Defendants have violated the First Amendment's protections of speech and

assembly.

117.   As a direct result of Defendants' violation of Plaintiffs' First Amendment rights to the freedom of speech and assembly, as alleged above, Plaintiffs are suffering irreparable harm for which there is no adequate remedy at law. Plaintiffs are therefore entitled to injunctive relief, as well as attorneys' fees.

**COUNT II**
**(Against Governor Walz, Attorney General Ellison,**
**Commissioner Malcolm, and MDH)**
**DENIAL OF EQUAL PROTECTION IN VIOLATION OF THE**
**FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION**

118.   Plaintiffs incorporate by reference each and every preceding paragraph of this Complaint and reallege the same as if fully set forth herein.

119.   The Order irrationally, unreasonably, and arbitrarily singles out young people who participate in youth sports for disfavored treatment.

120.   Minnesota's young people who desire to safely participate in sports are treated less favorably than individuals of other ages engaged in the same activities and individuals who engage in favored activities, including activities that activities Defendants know create a greater risk of COVID-19 transmission to participants and their communities.

121.   Defendants irrationally, unreasonably, and arbitrarily distinguish between persons that participate in banned youth sports activities and persons that participate in collegiate or professional sports.

122.   Defendants irrationally, unreasonably, and arbitrarily distinguish between persons that participate in banned youth sports activities and persons that shop at large, busy retail stores and engage in other commercial activities.

123.   Defendants decision to prohibit youth sports and activities arbitrarily and capriciously because their decision is not rooted in any factual basis supported by the record.

124.   Defendants favor certain persons and activities while disfavoring others without any basis for doing so.

125.   Defendants decision is irrational because Defendants data does not reasonably support its decision to ban youth sports. Defendants' failure to evaluate whether the youth sports ban increases the spread of COVID-19 violates Plaintiffs' due process rights, and Defendants' failure to evaluate equally whether to ban a particular group or activity violates or to apply such a ban equally among similarly situated persons violates Plaintiffs' equal protection rights.

126.   As a direct result of Defendants' violation of Plaintiffs' Fourteenth Amendment rights to equal protection of the law and due process, as alleged above, Plaintiffs are suffering irreparable harm for which there is no adequate remedy at law. Plaintiffs are therefore entitled to injunctive relief, as well as attorneys' fees.

## COUNT III
### (Against Governor Walz, Attorney General Ellison,
### Commissioner Malcolm, and MDH)
### VIOLATION OF THE RIGHT TO EQUAL PROTECTION AND DUE PROCESS,
### AS GUARANTEED BY THE MINNESOTA CONSTITUTION

127.   Plaintiffs incorporate by reference each and every preceding paragraph of this Complaint and reallege the same as if fully set forth herein.

128.   The Due Process Clause of Article I, section 7, of the Minnesota Constitution provides in relevant part that "[n]o person shall be . . . deprived of life, liberty or property without due process of law."

129.   The Equal Protection Clause of Article I, Section 2, of the Minnesota Constitution provides in relevant part that "[n]o member of this state shall be . . . deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers."

130.   For the same bases supporting Counts II under the federal Constitution, Defendants' actions have violated the Minnesota Constitution, which provides an independent source of rights and scrutiny.

131.   The Order irrationally, unreasonably, and arbitrarily singles out young people who participate in youth sports for disfavored treatment.

132.   Minnesota's young people who desire to safely participate in sports are treated less favorably than individuals of other ages engaged in the same activities and individuals who engage in favored activities, including activities that activities Defendants know create a greater risk of COVID-19 transmission to participants and their communities.

133.    Defendants irrationally, unreasonably, and arbitrarily distinguish between persons that participate in banned youth sports activities and persons that participate in collegiate or professional sports.

134.    Defendants irrationally, unreasonably, and arbitrarily distinguish between persons that participate in banned youth sports activities and persons that shop at large, busy retail stores and engage in other commercial activities.

135.    Defendants decision to prohibit youth sports and activities arbitrarily and capriciously because their decision is not rooted in any factual basis supported by the record.

136.    Defendants favor certain persons and activities while disfavoring others without any basis for doing so.

137.    Defendants decision is irrational because Defendants data does not reasonably support its decision to ban youth sports. Defendants' failure to evaluate whether the youth sports ban increases the spread of COVID-19 violates Plaintiffs' due process rights, and Defendants' failure to evaluate equally whether to ban a particular group or activity violates or to apply such a ban equally among similarly situated persons violates Plaintiffs' equal protection and due process rights.

138.    As a direct result of Defendants' violation of Plaintiffs' equal protection and due process rights under the Minnesota Constitution, as alleged above, Plaintiffs are suffering irreparable harm for which there is no adequate remedy at law. Plaintiffs are therefore entitled to injunctive relief.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for judgment against Defendants and that this Court:

A.      Adjudge, decree and declare the rights and other legal relations of the parties to the subject matter in controversy in order that such declarations shall have the force and effect of final judgment and that the Court retain jurisdiction of this matter for the purpose of enforcing the Court's orders;

B.      Pursuant to 28 U.S.C. § 2201, declare the aforementioned provisions of the Order, and to the extent such provisions are not severable, the entire Order, on its face and as applied to Plaintiffs, to be in violation of the First and Fourteenth Amendments to the United States Constitution and the Minnesota Constitution;

C.      Pursuant to 28 U.S.C. § 2201, declare the aforementioned unlawful actions of Defendants to be in violation of the First and Fourteenth Amendments to the United States Constitution, and the Minnesota Constitution, including any effect of the Order or any effort to enforce the Order to: (a) stop any Organized Youth Sport, as defined in the Order, from meeting for practices or game, or any business, facility, or entity serving or providing services to youth sports or activities; and (b) prohibit any form of protected expressive conduct, assembly, or speech;

D.      Pursuant to 28 U.S.C. § 2202, FED. R. CIV. P. 65, 42 U.S.C. § 1983 and 42 U.S.C. § 2000cc-2(a), (i) permanently enjoin Defendants from enforcing the Order to stop any Organized Youth Sport, as defined in the Order, from meeting for practices or game,

or any business, facility, or entity serving or providing services to youth sports or activities; and (ii) prohibit any form of protected expressive conduct, assembly, or speech;

      E.     Pursuant to 28 U.S.C. § 2202, FED. R. CIV. P. 65, 42 U.S.C. § 1983 and 42 U.S.C. §2000cc-2(a), award Plaintiffs nominal damages;

      F.     Pursuant to 42 U.S.C. § 1988, and FED. R. CIV. P. 54(d), and other applicable law, award Plaintiffs its reasonable attorneys' fees and costs; and

      G.     Grant such other and further relief as the Court deems equitable, just, and proper.

Dated: December 10, 2020         **CROSSCASTLE, P.A.**

                    By:   *s/ Samuel W. Diehl*
                        Samuel W. Diehl (#388371)
                        Ryan D. Wilson (#400797)
                        333 Washington Avenue N.
                        Ste 300-9078
                        Minneapolis, MN 55401
                        P: (612) 412-4175
                        F: (612) 234-4766
                        Email: sam.diehl@crosscastle.com
                                  ryan.wilson@crosscastle.com

                    **ATTORNEYS FOR PLAINTIFFS**

# Exhibit A

# STATE OF MINNESOTA
## Executive Department



## Governor Tim Walz

### Emergency Executive Order 20-99

### Implementing a Four Week Dial Back on Certain Activities
### to Slow the Spread of COVID-19

**I, Tim Walz, Governor of Minnesota,** by the authority vested in me by the Constitution and applicable statutes, issue the following Executive Order:

The COVID-19 pandemic continues to present an unprecedented and rapidly evolving challenge to our State. Minnesota has taken extraordinary steps to prevent and respond to the pandemic. On March 13, 2020, I issued Executive Order 20-01 and declared a peacetime emergency because this pandemic, an act of nature, threatens the lives of Minnesotans, and local resources are inadequate to address the threat. Since declaring the peacetime emergency, I have extended it every 30 days, with the most recent extension occurring on November 12, 2020.

Throughout the month of November, the data has made clear with each passing day that we need to take decisive and aggressive action to contain the most recent phase of the pandemic. Minnesota recently topped 240,000 total confirmed COVID-19 cases. It took Minnesota over 6 months to record 100,000 COVID-19 cases, but only 42 days to add an additional 100,000 new cases. We averaged a state record of over 6,000 cases per day over the previous week, and on November 14 we witnessed a record number of new cases (8,689). Today we mark another grim milestone, grieving the loss of 67 of our neighbors, the highest number of deaths in a single day. The Minnesota Department of Health's ("MDH") most recent weekly COVID-19 report found that the current average rate of new COVID-19 cases, hospitalizations and intensive care unit admissions, and deaths are the highest they have been since the start of the pandemic, far exceeding the numbers we saw in the worst points of our surges in April and May.

Minnesota's rate of "community spread"—meaning those cases that MDH cannot link to another case or a source of exposure—is particularly concerning. At least one third of all new COVID-19 infections in Minnesota have no known source. According to metrics developed by the White House Coronavirus Task Force ("Task Force"), Minnesota is officially in the "Red Zone"—the most critical level of concern—for two main indicators of uncontrolled spread: test positivity rate and new COVID-19 cases. MDH reports that the statewide percentage of positive COVID-19 tests has been steadily rising for the last four weeks, exceeding the 10% "Red Zone" threshold

**Exhibit A**

for the first time since early May. Further, the Task Force considers a state to be in the "Red Zone" for new cases when it reaches 100 cases per 100,000 residents over the course of a full week. Minnesota is currently averaging over 100 cases per 100,000 residents *each day.* These numbers tell a troubling story. The virus is everywhere, meaning that every interaction we have with people outside of our households poses a risk of transmission. When we cannot effectively trace infections due to community spread, we cannot keep COVID-19 out of our businesses, our schools, or the congregate care facilities that house our most vulnerable residents. For the benefit of our economy and all Minnesotans, we need to buckle down.

I recently issued Executive Order 20-96, which placed limits on the social gatherings and establishments that posed the most serious concern according to MDH data. In the week since, MDH has confirmed over 30 additional outbreaks connected to the gatherings, bars, and restaurants that were encompassed by Executive Order 20-96. Unfortunately, these numbers, our statewide cases, hospitalization rates, and our levels of community spread demonstrate that a temporary dial back on in-person social activity and restrictions on certain businesses are necessary.

Without question, these restrictions are significant and difficult, but this is not the "Stay-at-Home" Order that Minnesotans saw in March and April. As we noted in Executive Order 20-96, we have learned important lessons during this pandemic and must take thoughtful action when we can to prevent the worst projected outcomes. To effectively address a mounting healthcare crisis, we need to go beyond the measures taken in Executive Order 20-96. Accordingly, this Executive Order will also impact the entertainment venues, event spaces, and similar establishments that facilitate risky social interactions. In addition, as a former high school football coach, I recognize the positive health impacts and unique developmental and social benefits of sports. But the 192 outbreaks connected to sports are too concerning to let these activities continue during this dial back. Sports-related cases are nearly twice as prevalent among high school-age children as any other age group, and they increasingly play a key role in the need to move schools to distance learning. Gyms, fitness centers, and exercise studios also need to dial back their operations for similar reasons. The science shows us that exercise leads to higher levels of exertion and exhalation—often by individuals who are not wearing masks—greatly increasing the amount of airborne respiratory aerosol droplets that can carry COVID-19.

Finally, MDH has traced over 16,000 cases to out-of-state travel since the outset of this pandemic. The Centers for Disease Control and Prevention ("CDC") warns that travel increases our chances of getting and spreading COVID-19 and that avoiding travel is the best way for us to protect ourselves and others. Our nearest neighbors—North Dakota, South Dakota, Iowa, and Wisconsin—are experiencing some of the highest nationwide per capita increases in COVID-19 cases, and 48 states are now in the Task Force "Red Zone" for new COVID-19 cases. It is simply not a good time for out-of-state travel that is anything short of essential, so this Order clarifies my recommendation that Minnesotans refrain from unnecessary out-of-state travel for the next four weeks and self-quarantine upon their return if they do decide to travel.

MDH case numbers show that extending this dial back to certain settings and businesses is not necessary at this time. For example, we see relatively fewer outbreaks in retail settings, which generally involve brief, masked, transient interactions that pose lower transmission risk. According to the CDC, an individual is not considered a "close contact" of someone with COVID-19 unless they were within 6 feet of the individual for 15 or more minutes. These extended interactions can be limited in retail environments, and MDH will provide further guidance on how to do so. Similarly, professional athletes and collegiate athletic programs have developed strong protocols to protect their athletes, coaches, and staff, including regular testing and self-imposed restrictions when COVID-19 cases reach certain thresholds.

Outbreaks and cases traced to personal care establishments have also been minimal since those establishments reopened. Personal care typically involves one-on-one interactions (as opposed to interactions with multiple persons) and healthcare-like precautions (like the requirement to wear a face shield over a face covering in many situations), reducing the need to restrict these settings during this dial back. Finally, outdoor recreation is an essential outlet for Minnesotans during these challenging times. We discovered in the early stages of our spring reopening that these activities can occur safely, so I encourage Minnesotans to continue to pursue outdoor recreation with members of their household and in compliance with guidance from Department of Natural Resources.

In dialing back on social activities, in-person dining, sports, and fitness establishments, Minnesota joins an increasing number of states imposing similar measures, including California, Colorado, Illinois, Michigan, New Mexico, Oregon, Washington, and Vermont. Certain establishments and businesses can continue to offer goods and services in a safe manner in accordance with applicable guidance available at the Stay Safe Minnesota website (https://staysafe.mn.gov), but many will again have to weather the challenge of adjusting their operations to "to-go" or virtual means. In the near term, we know that this will be a hardship. In the long term, I hope that this significant step will prove beneficial to Minnesotans, our schools, and our economy, and safely bridge the gap to more permanent solutions to this pandemic.

In Minnesota Statutes 2020, section 12.02, the Minnesota Legislature conferred upon the Governor emergency powers to "(1) ensure that preparations of this state will be adequate to deal with disasters, (2) generally protect the public peace, health, and safety, and (3) preserve the lives and property of the people of the state." Pursuant to Minnesota Statutes 2020, section 12.21, subdivision 1, the Governor has general authority to control the state's emergency management as well as carry out the provisions of Minnesota's Emergency Management Act.

Minnesota Statutes 2020, section 12.21, subdivision 3(7), authorizes the Governor to cooperate with federal and state agencies in "matters pertaining to the emergency management of the state and nation." This includes "the direction or control of . . . the conduct of persons in the state, including entrance or exit from any stricken or threatened public place, occupancy of facilities, and . . . public meetings or gatherings." Pursuant to subdivision 3 of that same section, the Governor may "make, amend, and rescind the necessary orders and rules to carry out the provisions" of Minnesota Statutes 2020, Chapter 12. When approved by the Executive Council

and filed in the Office of the Secretary of State, such orders and rules have the force and effect of law during the peacetime emergency. Any inconsistent rules or ordinances of any agency or political subdivision of the state are suspended during the pendency of the emergency.

For these reasons, I order as follows:

1. Executive Orders 20-74, 20-85, and 20-96 are rescinded as of Friday, November 20, 2020 at 11:59 pm.

2. Paragraphs 6 and 7 of this Executive Order are effective from Friday, November 20, 2020 at 11:59 pm through Friday, December 18, 2020 at 11:59 pm.

3. **Masks and face coverings required.** Executive Order 20-81, requiring face coverings in certain settings, remains in full force and effect.

4. **At-risk persons.** All persons currently living within the State of Minnesota who are at risk of severe illness from COVID-19, as defined by Executive Order 20-55, are strongly urged to stay at home or in their place of residence and follow the provisions of Executive Order 20-55.

5. **Definitions.**

   a. "Home," "homes," "residence," and "residences" are broadly defined to include mobile homes, hotels, motels, shared rental units, shelters, and similar facilities, to the extent they are used for lodging.

   b. "Worker" and "workers" are broadly defined to include owners, proprietors, employees, contractors, vendors, volunteers, and interns.

   c. "Business" and "businesses" are broadly defined to include entities that employ or engage workers, including private-sector entities, public-sector entities, non-profit entities, and state, county, and local governments.

   d. "Critical Businesses" are all businesses whose workers qualified for a Critical Sector exemption under paragraph 6 of Executive Order 20-48.

   e. "Non-Critical Businesses" are all businesses that are not Critical Businesses or Places of Public Accommodation.

   f. "Place of Public Accommodation" means a business, or an educational, refreshment, entertainment, recreation facility, or an institution of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public. This definition also includes those businesses, facilities, and institutions that offer or provide shared or communal goods, services, facilities, privileges, advantages, or accommodations to members of more than a single household, regardless of whether they are made available

to the public. Places of Public Accommodation include, but are not limited to, the businesses identified in paragraph 7.c of this Executive Order.

    g.   "Establishments Providing Personal Care Services" are broadly defined to include tanning establishments, body art establishments, tattoo parlors, piercing parlors, businesses offering massage therapy or similar body work, spas, salons, nail salons, cosmetology salons, esthetician salons, advanced practice esthetician salons, eyelash salons, and barber shops. This includes, but is not limited to, all salons and shops licensed by the Minnesota Board of Cosmetologist Examiners and the Minnesota Board of Barber Examiners.

    h.   "Organizers" are businesses or individuals who plan, organize, host, or disseminate information encouraging people to attend prohibited social gatherings.

6.  **Activities outside of the home.** Mindful that we must continue to limit social interactions to protect public health, individual activities outside of the home are subject to the limitations and guidelines set forth below. These requirements may be clarified, as deemed necessary by the Governor, to ensure the health, safety, and security of all Minnesotans. Clarifications will be available for public review at the Stay Safe Minnesota website (https://staysafe.mn.gov).

    a.   **Social gatherings prohibited.** Except as specifically permitted in this Executive Order, social gatherings are prohibited. Social gatherings are groups of individuals, who are not members of the same household, congregated together for a common or coordinated social, community, or leisure purpose—even if social distancing can be maintained. This prohibition includes indoor and outdoor gatherings, planned and spontaneous gatherings, and public and private gatherings. Organizers of prohibited social gatherings may be subject to appropriate enforcement action by city, county, and/or state authorities pursuant to paragraph 10 of this Executive Order.

        i.   **Activity by workers or customers.** Prohibited social gatherings do not include activity by workers or customers of businesses permitted to remain open under this Executive Order, providing that those businesses follow the requirements and limitations set forth in this Executive Order.

        ii.   **Places of Public Accommodation permitted to be open.** Prohibited social gatherings do not include persons in Places of Public Accommodation that are permitted to be open to members of the public under this Executive Order, provided that those Places of Public Accommodation follow the requirements and limitations set forth in this Executive Order.

        iii.   **Educational and care services for children and youth.** Prohibited social gatherings do not include educational and care services for

children and youth, including child care, educational support services for distance and hybrid learners, and other educational services. Prohibited social gatherings do not include services in a personal home, such as family, friend, and neighbor care necessary for workers to continue to perform their duties. Individuals and programs providing educational support services must follow the applicable guidance available at the Stay Safe Minnesota website (https://staysafe.mn.gov).

iv.   **Care of others.** Individuals may care for a family member, friend, or pet in another household, and may transport family members, friends, or pets, including the transport of children pursuant to existing parenting time schedules or other visitation schedules pertaining to a child in need of protective services (CHIPS) proceeding.

v.   **Relocation to ensure safety.** Nothing in this Executive Order should be construed to prevent individuals whose homes or residences are unsafe or become unsafe, including individuals who have suffered or are at risk of domestic violence or for whom the safety, sanitation, or essential operations of their home or residence cannot be maintained, from leaving their home or residence, or relocating to a safe alternative home or residence.

vi.   **Health and safety activities.** Nothing in this Executive Order should be construed to prevent individuals from seeking emergency services; obtaining medical services, supplies, or medications; donating blood; or visiting a healthcare or dental professional or facility, or a veterinarian.

vii.   **Sobriety and mental health support groups.** Prohibited social gatherings do not include sobriety or other mental health support groups. Remote meetings are encouraged whenever possible. When remote meetings are not possible, smaller meetings of shorter duration are encouraged. Any in-person meetings must comply with applicable public health guidance, including relevant MDH guidance.

viii.   **Health care and residential facilities.** Prohibited social gatherings do not include gatherings of persons in health care facilities, long-term care facilities, residential treatment facilities, residential and in-home programs licensed by the Minnesota Department of Human Services, correctional facilities, juvenile justice facilities, and shelters or drop-in centers. These facilities and settings must continue to follow applicable state and federal guidance, including guidance related to visitation. In-person visitation may not be possible under that guidance, and individuals are strongly encouraged to visit with loved ones virtually.

ix.  **Displacement.** Individuals without a home are exempt from the restrictions on gatherings in this Executive Order, but they are strongly encouraged to avoid gatherings whenever possible. Executive Order 20-55, which includes provisions related to encampments, remains in full force and effect.

x.  **Moving or relocation.** Individuals are permitted to move to a new home or place of residence, provided that they follow MDH and CDC guidelines to the maximum extent possible.

xi.  **Legislative and other governmental meetings.** The limits on gatherings in this Executive Order do not apply to legislative and other governmental meetings. Remote meetings are strongly encouraged whenever possible as permitted by state or local authority.

xii.  **The Judicial Branch.** The limits on gatherings in this Executive Order do not apply to proceedings held by the Minnesota Judicial Branch. Proceedings held by the Judicial Branch are subject to the policies established by the chief justice and will occur as directed by court order. Individuals may appear as directed by a Minnesota state court, including to serve as a juror, appear as a party, as a witness, or as legal counsel on behalf of a party, or otherwise to comply as directed by a court order, subpoena, or summons.

xiii.  **Federal activities.** Nothing in this Executive Order will be construed to limit, prohibit, or restrict in any way the operations of the federal government or the movement of federal officials in Minnesota while acting in their official capacity, including federal judicial, legislative, and executive staff and personnel.

xiv.  **Drive-in gatherings.** To enable safe congregation of people, drive-in gatherings are permitted, provided that all participants remain within their own vehicles and follow the applicable guidance available at the Stay Safe Minnesota website (https://staysafe.mn.gov).

xv.  **Weddings, funerals, and services.** Places of worship, funeral homes, and other venues that offer gathering space for wedding ceremonies, funeral services, or other planned services such as worship, rituals, prayer meetings, or scripture studies are strongly encouraged to offer virtual alternatives to the maximum extent possible. Places of worship, funeral homes, and other venues that offer gathering space for wedding services, funeral services, or other planned services such as worship, rituals, prayer meetings, or scripture studies, may host such wedding ceremonies, funeral services, or other services, provided that they adhere to the following requirements:

A. In all settings, ensure a minimum of 6 feet of physical distancing between households.

B. In indoor settings, occupancy must not exceed 50 percent of the normal occupant capacity as determined by the fire marshal, with a maximum of 250 people in a single self-contained space.

C. In outdoor settings, gatherings must not exceed 250 individuals.

D. Develop and implement a COVID-19 Preparedness Plan in accordance with applicable guidance available at the Stay Safe Minnesota website (https://staysafe.mn.gov).

xvi. **Celebrations and receptions.** Individuals, venues, and businesses **must not** host celebrations, receptions, private parties, or other social gatherings, including but not limited to those connected to weddings, funerals, life milestones (such as birthdays or retirements), family reunions, planned religious services, and other similar occasions.

b. **Outdoor recreational activity.** Individuals **must not** engage in outdoor recreational activities where they will come into close proximity with others from different households. Individuals may engage in the activities listed below, provided that they follow the Minnesota Department of Natural Resources ("DNR") and MDH guidelines on outdoor recreation and guidelines for facilities and the public ("Outdoor Recreation Guidelines"), available at DNR's COVID-19 website (https://www.dnr.state.mn.us/covid-19.html):

i. Individuals may engage in any outdoor activity that is dependent upon or derives its principal benefit from natural surroundings and open space, including but not limited to hunting, fishing, trapping, boating, hiking, biking, golfing, picnicking, skiing, skating, and snowshoeing for the purposes of pleasure, rest, exercise, or relaxation, provided that the activity can be engaged in accordance with the Outdoor Recreation Guidelines, including maintaining at least six feet of separation between participants from different households. Groups **within a single household** may engage in outdoor activities or sports that do not allow for social distancing (*e.g.*, soccer or basketball) but must not engage in such activities with members of other households.

ii. Outdoor recreational activities allowed by this Executive Order **do not include** performances, competitions, team events, tournaments, races, rallies, organized sports, organized group classes, spectator events, fairs, or any other events that involve the gathering of individuals from

more than one household. This paragraph does not impact professional or intercollegiate sports activities permitted under paragraph 7.h.ii.

    iii.   All persons participating in outdoor recreational activities under this Executive Order must follow the Outdoor Recreation Guidelines available at DNR's COVID-19 website (https://www.dnr.state.mn.us/covid-19.html).

    iv.   Nothing in this paragraph permits trespass upon private property, and all activities undertaken pursuant to this paragraph must be undertaken in accordance with Minnesota law, including but not limited to license and permit requirements, invasive species regulations, and park rules. Nothing in this paragraph should be construed to abrogate existing local authority to limit or restrict activities or close facilities.

c.   **Voting.** Individuals are permitted and encouraged to vote in all state and local elections. Voters are also encouraged to vote by mail using an absentee ballot where feasible. Additional information is available at the Secretary of State's website (https://www.sos.state.mn.us/election-administration-campaigns/elections-calendar/2020-elections-and-covid-19/).

d.   **Unnecessary travel strongly discouraged.** Consistent with federal guidance and to protect our neighbors, Minnesotans are encouraged to stay close to home and are strongly discouraged from engaging in unnecessary travel, particularly to other states or countries.

e.   **Travel advisory.** Persons arriving in Minnesota from other states or countries, including returning Minnesota residents, are strongly encouraged to practice self-quarantine for 14 days after arrival by limiting their interactions to their immediate household. This recommendation does not apply to individuals who must cross state or country borders for work, study, medical care, or personal safety and security. Students returning home for school breaks are strongly encouraged to follow the recommendations available at MDH's Institutes of Higher Education website (https://www.health.state.mn.us/diseases/coronavirus/schools/ihe.html).

f.   **Guidelines.** Individuals engaging in activities outside of the home must follow the requirements of this Executive Order, Executive Order 20-81 (face coverings), and MDH and CDC Guidelines. Individuals engaging in outdoor recreational activities must follow the Outdoor Recreation Guidelines available at DNR's COVID-19 website (https://www.dnr.state.mn.us/covid-19.html).

g.   **Tribal activities and lands.**

    i.   Activities by tribal members within the boundaries of their tribal reservations are exempt from the restrictions in this Executive Order but may be subject to restrictions by tribal authorities.

  ii. Activities within the boundaries of federal land held in trust for one of the 11 Minnesota Tribal Nations are exempt from the restrictions in this Executive Order but may be subject to restrictions by tribal authorities.

  iii. Activities by tribal members to exercise their federal treaty rights within the boundaries of their treaty territory (also known as "ceded territory") are exempt from the restrictions in this Executive Order but may be subject to restrictions by applicable tribal authorities.

  iv. Tribal members may travel to and from their tribal reservations in accordance with applicable tribal law.

7. **Workers and businesses.** Workers and businesses are subject to the requirements set forth below. These requirements may be clarified, as deemed necessary by the Governor, to ensure the health, safety, and security of all Minnesotans. Clarifications will be available for public review at the State's COVID-19 website (https://mn.gov/covid19/).

  a. **Continue to work from home whenever possible.** Any worker who can work from home must do so.

  b. **Safe work.** The protections noted in Executive Order 20-54 (Protecting Workers from Unsafe Working Conditions and Retaliation) remain in full force and effect. All work must be conducted in a manner that adheres to Minnesota OSHA Standards and MDH and CDC Guidelines, including social distancing and hygiene practices. Under existing law and authority, DLI may issue citations, civil penalties, or closure orders to places of employment with unsafe or unhealthy conditions, and DLI may penalize businesses that retaliate against employees who raise safety and health concerns.

  c. **Places of Public Accommodation.** Places of Public Accommodation are subject to the following requirements and limitations:

   i. **All Places of Public Accommodation open under this Executive Order must adhere to the requirements set forth in paragraph 7.d of this order**, including development and implementation of a COVID-19 Preparedness Plan in accordance with applicable guidance available at the Stay Safe Minnesota website (https://staysafe.mn.gov).

   ii. For the purposes of this Executive Order, the following establishments and facilities are not Places of Public Accommodation:

    A. Establishments and facilities that offer food and beverage not for on-premises consumption, including grocery stores, markets, convenience stores, pharmacies, drug stores, and food pantries, other than those portions of the Place of Public

Accommodation otherwise subject to the requirements of this paragraph 7.c.

B. Health care facilities, child care facilities, residential care facilities, congregate care facilities, correctional facilities, and juvenile justice facilities.

C. Crisis shelters, soup kitchens, or similar institutions.

D. Restaurants and food courts inside the secured zones of airports.

iii. **Certain Places of Public Accommodation Closed to Members of the Public.** The following Places of Public Accommodation are closed to members of the public as set forth below. "Members of the public" means people who are not workers affiliated with the Place of Public Accommodation.

A. Restaurants, food courts, cafes, coffeehouses, bars, taverns, breweries, microbreweries, distilleries, brewer taprooms, micro distiller cocktail rooms, tasting rooms, wineries, cideries, clubhouses, dining clubs, tobacco product shops, hookah bars, cigar bars, vaping lounges, and other Places of Public Accommodation offering food, beverages (including alcoholic beverages), or tobacco products for on-premises consumption are closed to ingress, egress, use, and occupancy by members of the public, except as set forth below.

1. The above establishments may, and are encouraged to, offer food and beverage using delivery services, window service, walk-up service, drive-through service, or drive-up service. In offering food or beverage service under this paragraph, a Place of Public Accommodation may permit up to five members of the public at one time in the place of public accommodation for the purpose of picking up their food or beverage orders. All such establishments must follow the requirements for all businesses set forth below and industry-specific guidance available on the Stay Safe Minnesota website (https://staysafe.mn.gov).

2. Because indoor dine-in service is prohibited at restaurants, for the purposes of Minnesota Laws 2020, Chapter 75, Limited Off-Sale for Restaurants Closed by Executive Order, nothing in this Executive Order constitutes, prescribes, or should be deemed as, the expiration, termination, or rescission of the closure of

11

restaurants as set forth in Executive Order 20-04, as modified and extended by Executive Orders 20-18 and 20-33, or any subsequent order. As set forth in Minnesota Laws 2020, Chapter 75, limited off-sale of alcoholic beverages is authorized only for take-out service with a prepared take-out food order, and delivery is not authorized.

B. Public pools, as defined in Minnesota Statutes 2020, Section 144.1222, subdivision 4(d), are closed to ingress, egress, use, and occupancy.

C. Gymnasiums, fitness centers, recreation centers, indoor sports facilities, indoor climbing facilities, trampoline parks, indoor and outdoor exercise facilities, martial arts facilities, and dance and exercise studios are closed to ingress, egress, use, and occupancy by members of the public. This includes shared or communal facilities serving more than a single household, regardless of whether such facilities are open to the public, including but not limited to those facilities located in an apartment building, condominium, or housing complex. Outdoor sports and recreation facilities may be open to members of the public only as permitted under paragraph 7.c.iv. These establishments may, and are encouraged to, use their facilities to provide virtual or remote programming. These establishments may also remain open to exclusively provide services permitted under paragraphs 7.e and 7.f.

D. Venues providing indoor events and entertainment such as theaters, cinemas, concert halls, festivals, fairs, vendor fairs, museums, performance venues, stadiums, arcades, and bowling alleys are closed to ingress, egress, use, and occupancy by members of the public. Such establishments may, and are encouraged to, use their facilities to provide virtual or remote programming.

E. Venues providing outdoor events and entertainment such as racetracks, paintball, go-karts, mini-golf, performance venues, festivals, fairs, vendor fairs, and amusement parks are closed to ingress, egress, use, and occupancy by members of the public. Such venues may offer "drive-in" or "drive-through" experiences, provided that all participants remain within their own vehicles and follow the applicable guidance available at the Stay Safe Minnesota website (https://staysafe.mn.gov).

F. For professional and intercollegiate athletes and teams authorized to practice and compete under paragraph 7.h.ii.B

12

and C, this closure of event and entertainment venues to members of the public means that only athletes, coaches, and other essential staff are authorized to be present in venues hosting these activities. Spectators, including family and friends of participants and staff, are not permitted to attend permitted sporting events or practices.

iv. **Outdoor recreational facilities.** The below facilities are permitted to be open and do business, provided that they adhere to paragraphs 6 and 7 of this Executive Order and the Outdoor Recreation Guidelines available at the Stay Safe Minnesota website (https://staysafe.mn.gov). Businesses and Places of Public Accommodation associated with outdoor recreational facilities must comply with paragraphs 6 and 7 of this Executive Order, as applicable, including closure to members of the public pursuant to paragraph 7.c. I encourage public outdoor recreational facilities to be open for all Minnesotans, including families and children, and direct all individuals utilizing such facilities to follow the Outdoor Recreation Guidelines. All outdoor recreational activities and facilities must also comply with Minnesota law, including but not limited to license and permit requirements, invasive species regulations, and park rules.

    A. Minnesota State Parks, Trails, State Forests, State Recreation Areas, Wildlife Management Areas, Scientific and Natural Areas, and other State managed recreational lands.

    B. Locally, regionally, publicly, and privately managed outdoor parks, trails, arboretums, and gardens.

    C. State, regional, or local public water accesses.

    D. Public and private marinas and docks that provide storage, docking, and mooring services to slip owners, seasonal renters, and the general public, as well as facilities that provide safety-related services including fueling, emergency dockage, and sanitary pump-out stations.

    E. Public and private golf courses and outdoor driving ranges.

    F. Ski areas, Nordic trails, snow tubing hills, sledding hills, and outdoor skating rinks.

    G. Lake service providers to install, repair, and remove docks, boatlifts, and other water related equipment or deliver boats.

    H. Outdoor shooting ranges and game farms.

13

I. Outdoor recreational equipment rental outlets. Equipment may be rented but only if the equipment can be effectively sanitized between uses. Such outlets must implement clear check-in and check-out procedures that minimize contact between customers and workers. Any rentals must be conducted in accordance with the Outdoor Recreation Guidelines.

J. Dispersed and remote camping sites in accordance with the Outdoor Recreation Guidelines. A dispersed campsite is a single campsite, not in a developed campground, used for overnight camping. A remote campsite is a designated backpack or watercraft campsite, not in a developed campground, used for overnight camping.

K. Public and private campgrounds that have adopted a COVID-19 Preparedness Plan in accordance with the Guidance for Campgrounds website (https://www.dnr.state.mn.us/aboutdnr/safely-opening-outdoor-recreation.html).

L. Charter boats and launches that have adopted a COVID-19 Preparedness Plan in accordance with Guidance for Charter and Launch Boats website (https://www.dnr.state.mn.us/aboutdnr/safely-opening-outdoor-recreation.html).

M. Guided and instructional activities such as guided fishing or birding that do not require gatherings prohibited by paragraph 6.c, adhere to social distancing requirements, involve persons from the same household, and are conducted in accordance with the Outdoor Recreation Guidelines. This paragraph does not apply to activities covered by paragraphs 7.c.vii or 7.f.

N. Any other outdoor recreation activities and facilities that may be designated in the Outdoor Recreation Guidelines.

v. Barbershops, salons, and other Establishments Providing Personal Care Services may remain open. Occupancy must not exceed 50 percent of the normal occupant capacity as determined by the fire marshal, with a maximum of 250 people in a single self-contained space. Workers, customers, and clients must follow all requirements, including face-covering requirements, as set forth in the applicable guidance available at the Stay Safe Minnesota website (https://staysafe.mn.gov).

14

vi.   This Executive Order does not prohibit a worker or supplier of a Place of Public Accommodation from entering, exiting, using, or occupying that Place of Public Accommodation in their professional capacity.

vii.  Places of Public Accommodation not within the categories set forth in paragraph 7.c.iii may be open to members of the public, provided that they follow the requirements for all businesses set forth below and any applicable industry-specific guidance available on the Stay Safe Minnesota website (https://staysafe.mn.gov).

d.  **Requirements for all businesses.** Since June 29, 2020, all businesses in Minnesota (whether Critical or Non-Critical) have been required to have a COVID-19 Preparedness Plan ("Plan") and implement that plan. All businesses must continue to follow the same requirements. Each Plan must provide for the business's implementation of guidance for their specific industry or, if there is no specific guidance, general guidance for all businesses, as well as Minnesota OSHA Standards and MDH and CDC Guidelines in their workplaces. These requirements are set forth in guidance ("Plan Guidance") available on the Stay Safe Minnesota website (https://staysafe.mn.gov).

i.   **Required Plan content.** As set forth in the Plan Guidance, at a minimum, each Plan must adequately address the following areas:

A.  **Require work from home whenever possible.** All Plans must ensure that all workers who can work from home continue to do so.

B.  **Ensure that sick workers stay home.** All Plans must establish policies and procedures, including health screenings, that prevent sick workers from entering the workplace.

C.  **Social distancing.** All Plans must establish social distancing policies and procedures.

D.  **Worker hygiene and source control.** All Plans must establish hygiene and source control policies for workers.

E.  **Cleaning, disinfection, and ventilation protocols.** All Plans must establish cleaning, disinfection, and ventilation protocols for areas within the workplace.

ii.  **Customer facing businesses.** All businesses that are customer facing (*i.e.*, businesses that have in-person customer interactions) must include additional Plan provisions to keep the public and workers safe as set forth in the applicable guidance available on the Stay Safe Minnesota website (https://staysafe.mn.gov). This includes requirements that workers and customers must maintain physical

15

distancing of 6 feet and that store occupancy must not exceed limits set forth in the guidance. In customer facing businesses that share common areas, such as malls, all Plans must similarly include a facility occupancy that must not exceed the limits set forth in the guidance and provide an enhanced sanitizing, cleaning, and disinfecting regimen consistent with Minnesota OSHA Standards and MDH and CDC Guidelines for those common areas. All Plans must also include signage in common areas to discourage congregating.

iii.   **Household services businesses.** All businesses that provide household services (*e.g.*, housecleaning, maid services, and piano tuners) must also develop Plan provisions intended to keep customers and workers safe as set forth in the applicable guidance available on the Stay Safe Minnesota website (https://staysafe.mn.gov).

iv.   **Optional template.** A template COVID-19 Preparedness Plan, which covers the above requirements, is available as part of the Plan Guidance, available on the Stay Safe Minnesota website (https://staysafe.mn.gov).

v.   **Certification and signature.** Senior management responsible for implementing the Plan must sign and certify the Plan, affirming their commitment to implement and follow the Plan.

vi.   **Dissemination and posting.** Each business must provide its Plan, in writing, to all workers, and the Plan must be posted at all of the business's workplaces in locations that will allow for the Plan to be readily reviewed by all workers. Where physical posting is impracticable, the Plan can be posted electronically, provided that the Plan is received by all workers and remains available for their review.

vii.   **Training.** Each business must ensure that training is provided to workers on the contents of its Plan and required procedures, so that all workers understand and are able to perform the precautions necessary to protect themselves and their co-workers. This training should be easy to understand and available in the appropriate language and literacy level for all workers. Businesses should also take steps to supervise workers and ensure that workers understand and adhere to necessary precautions to prevent COVID-19 transmission. Documentation demonstrating compliance with this training requirement must be maintained and made available to regulatory authorities and public safety officers, including DLI, upon request.

viii.   **Compliance.** Workers and management must work together to ensure compliance with the Plan, implement all protocols, policies, and procedures, and create a safe and healthy work environment.

ix. **Exposure notification protocol.** As set forth in the general industry guidance available on the Stay Safe Minnesota website (https://staysafe.mn.gov), businesses must establish a protocol for identifying and communicating with workers who may have been exposed to a person with COVID-19 symptoms or who has tested positive for COVID-19 while at work.

x. **Availability to regulatory authorities and public safety officers.** Businesses do not need to submit their Plans for preapproval. Upon request, businesses must make their Plans available to regulatory authorities and public safety officers, including DLI, MDH, the Minnesota Attorney General's Office, and city and county attorneys.

xi. In the event of a complaint or dispute related to a business's Plan, DLI is authorized to determine whether the Plan adequately implements the applicable guidance, Minnesota OSHA Standards and MDH and CDC Guidelines in its workplaces.

e. **Child care.** Licensed child care providers, including child care centers, certified child care centers, family and group day care homes, and license exempt child care, may continue to operate and serve families. Child care providers continuing to operate must do so in accordance with the following requirements:

i. Child care providers other than family, friends, or neighbors providing license exempt care to children from only one household must adhere to the requirements set forth in paragraph 7.d of this Executive Order, including development and implementation of a COVID-19 Preparedness Plan in accordance with applicable guidance for schools and child care available on the Stay Safe Minnesota website (https://staysafe.mn.gov/).

ii. Child care providers must comply with any public restrictions implemented by the manager or owner of property or facilities used by the program, including any restrictions set by schools or school districts on use of their facilities.

f. **Youth Programs.** Youth programs that provide care or supervision of children can continue to operate if they can do so safely in accordance with the COVID-19 Prevention Guidance for Youth and Student Programs available on the Stay Safe Minnesota website (https://staysafemn.gov/).

i. "Youth Programs" means programs providing care or enrichment to children or adolescents that require registration and have on-site supervision. This includes certified child care centers, youth enrichment programs, programs exempt from licensure, community education classes, community center based programs, school age care

17

programs operated by public and private schools, parks and recreation programs, art programs, and day camps (but not overnight camps). "Youth Programs" does not include:

    A.  Licensed child care facilities or school-district summer learning programs; or

    B.  Organized Youth Sports organizations and programs, described in paragraph 7.g, unless the primary purpose of the program is to provide care or supervision to children or youth, and not provide sports instruction or competition.

    ii.  Youth Programs must adhere to the requirements set forth in paragraph 7.d of this Executive Order, including development and implementation of a COVID-19 Preparedness Plan in accordance with guidance for youth and student programs available on the Stay Safe Minnesota website (https://staysafemn.gov/). COVID-19 Preparedness Plans must be distributed, available for review, and followed by participants and their parents or guardians.

    iii.  Youth Programs must comply with any public health restrictions implemented by the manager or owner of property or facilities used by the program, including any restrictions set by schools or school districts on the use of their facilities.

g.  **Organized Youth Sports.** Organized Youth Sports organizations and programs must stop all in-person activities—including practices, group workouts, games, and tournaments.

    i.  "Organized Youth Sports" means any sports activity, where participants are children or adolescents, organized by an entity, association, club, or organization providing for registration of participants and oversight on a regular basis for a defined period of time. Sports activities within this definition include all sports offered by schools (public and nonpublic), the Minnesota State High School League, or similar organizations, as well as dance, cheerleading, and other sports traditionally offered by supplemental associations or organizations.

    ii.  The requirement in this paragraph, 7.g, that Organized Youth Sports organizations and programs stop in-person activities does not apply to:

    A.  Child care providers and Youth Programs as set forth in paragraphs 7.e and 7.f that have as their primary purpose to provide care and supervision to children or youth.

    B.  Physical education instruction that meets academic requirements as part of the school day.

18

      C.  Participation in outdoor recreational activities or sports by an individual or individuals within a single household as allowed by paragraph 6.b.

h. **Organized Adult Sports.** Organized Adult Sports organizations and programs must stop all in-person activities—including practices, group workouts, games, and tournaments.

      i.  "Organized Adult Sports" means any sports activity, where participants are adults, organized by an entity, association, club, or organization providing for registration of participants and oversight on a regular basis for a defined period of time.

      ii.  The requirement in this paragraph, 7.h, that Organized Adult Sports stop in-person activities does not apply to:

            A.  Participation in outdoor recreational activities or sports by an individual or individuals within a single household as allowed by paragraph 6.b of this Executive Order.

            B.  Professional sports, meaning sports in which the athletes receive non-de minimis payment for performance.

            C.  Any collegiate or university institution team or athlete participating in intercollegiate athletics, provided that the team or athlete follows guidance for sports activities as listed in *Recommendations for Different Levels of COVID-19 Transmission Among Higher Education Institutions*, available at MDH's Institutes of Higher Education website (https://www.health.state.mn.us/diseases/coronavirus/schools/ihe.html).

i. **Higher education institutions.** Higher education institutions, in consultation with their governing boards, may offer in-person classes or activities consistent with MDH guidelines for offering in-person or on-site activities and programming at higher education institutions. Higher education institutions must follow guidelines available at MDH's Institutes of Higher Education website (https://www.health.state.mn.us/diseases/coronavirus/schools/ihe.html). This includes following parameters set forth in *Recommendations for Different Levels of COVID-19 Transmission Among Higher Education Institutions,* available at MDH's Institutes of Higher Education website. Education and training programs not registered or licensed with OHE or part of the Minnesota State Colleges and Universities or University of Minnesota systems must follow the guidance provided by the state agency or governing board under which they are authorized to operate. In the absence of an

applicable state agency or governing board, higher education institutions must follow MDH guidelines.

i. **Higher education definitions.** For the purposes of paragraph 7.i of this Executive Order:

    A. "Higher education institution" means the Minnesota State Colleges and Universities, the University of Minnesota, private colleges and universities and all other post-secondary institutions, including but not limited to institutions licensed and registered with the OHE, with a physical campus in the State.

    B. "Staff and instructors" means all employees, contractors, and volunteers of a higher education institution, including but not limited to janitorial and cleaning professionals, secretarial and administrative professionals, instructors, instructor assistants, researchers, research assistants, graduate assistants, faculty, and administrators.

    C. "Students" means any person enrolled at a higher education institution.

    D. "Activities" includes, but is not limited to, testing, short-term training programs, student services, advising, clinical rotations or placements, customized training, internships, campus visits, programs, credit and non-credit classes, and all research activities and functions.

ii. **Requirements for higher education institutions**. Higher education institutions must continue to establish and implement a higher education institution COVID-19 Preparedness Plan ("Higher Ed Plan"). Each Higher Ed Plan must provide for implementation of Minnesota OSHA Standards and MDH and CDC Guidelines in classrooms, labs, or other areas that students and staff may visit. Such requirements, which are adaptable to higher education institutions, are set forth in the general guidance available at the Stay Safe Minnesota website (https://staysafe.mn.gov) and other applicable guidelines.

    A. **Required Higher Ed Plan content.** At a minimum, each Higher Ed Plan must adequately address the following areas:

        1. **Follow OHE and MDH guidance.** All in-person activities must be subject to limitations set forth in relevant OHE and MDH guidance.

        2. **Ensure that sick students and institution staff and instructors stay home.** Each Higher Ed Plan must

establish policies and procedures, including health screenings, that prevent sick students or institution staff and instructors from entering the institution for in-person or on-site activities.

3. **Require social distancing and face-coverings.** Each Higher Ed Plan must implement social distancing policies and procedures set forth by the CDC and MDH. Higher Ed Plans must also include signage in common areas to discourage gathering. Each Higher Ed Plan must ensure compliance with the applicable face-covering requirements set forth in Executive Order 20-81.

4. **Implement cleaning and disinfection protocols.** Each Higher Ed Plan must establish cleaning and disinfection protocols for areas within the institution where students, staff, and instructors may visit and provide an enhanced sanitizing, cleaning, and disinfecting regimen consistent with Minnesota OSHA Standards and MDH and CDC Guidelines for common areas.

B. **Certification and signature.** Institutional leadership responsible for implementing the Higher Ed Plan must sign and certify such Higher Ed Plan, affirming their commitment to implement and follow the Higher Ed Plan.

C. **Dissemination and posting.** A higher education institution must make its Higher Ed Plan available according to applicable guidance.

D. **Training.** Higher education institutions must ensure that staff and instructors are trained on the contents of their Higher Ed Plan according to applicable guidance.

8. **Respect for workers.** Minnesotans must respect the efforts of employers and businesses to protect the safety of their workers and customers by complying with those businesses' social distancing and hygiene instructions. Employers and businesses must post social distancing and hygiene instructions at entrances and in locations that can be easily seen by customers and visitors.

9. **Enhanced local measures permitted.** Nothing in this Executive Order or previous Executive Orders should be construed to prohibit or prevent political subdivisions from implementing, within their jurisdictions and pursuant to applicable law and authority, restrictions beyond the restrictions contained in this Executive Order, as long as those additional restrictions have a real or substantial relation to the public health crisis caused by COVID-19. Pursuant to Minnesota Statutes 2020, section

12.32, political subdivisions may not relax or reduce this Executive Order's restrictions. In other words, to the extent that they have authority to do so, cities and other political subdivisions may take actions that are more protective of the public health but may not take actions that are less protective of the public health.

10. **Enforcement.** I urge all Minnesotans to voluntarily comply with this Executive Order. Pursuant to Minnesota Statutes 2020, section 12.45, an individual who willfully violates this Executive Order is guilty of a misdemeanor and upon conviction must be punished by a fine not to exceed $1,000 or by imprisonment for not more than 90 days. Any business owner, manager, or supervisor who requires or encourages any of their employees, contractors, vendors, volunteers, or interns to violate this Executive Order is guilty of a gross misdemeanor and upon conviction must be punished by a fine not to exceed $3,000 or by imprisonment for not more than a year. In addition to those criminal penalties, the Attorney General, as well as city and county attorneys, may investigate and seek any civil relief available pursuant to Minnesota Statutes 2020, section 8.31, for violations or threatened violations of this Executive Order, including but not limited to injunctive relief, civil penalties in an amount to be determined by the court, up to $25,000 per occurrence, costs of investigation and reasonable attorney's fees and costs, and other equitable relief as determined by the court in accordance with section 8.31. State and local licensing and regulatory entities that inspect businesses for compliance with rules and codes to protect the public are encouraged to assess regulated businesses' compliance with this Executive Order and use existing enforcement tools to bring businesses into compliance. Nothing in this Executive Order is intended to encourage or allow law enforcement to transgress individual constitutional rights

Pursuant to Minnesota Statutes 2020, section 4.035, subdivision 2, and section 12.32, this Executive Order is effective immediately upon approval by the Executive Council. It remains in effect until the peacetime emergency declared in Executive Order 20-01 is terminated or until it is rescinded by proper authority.

A determination that any provision of this Executive Order is invalid will not affect the enforceability of any other provision of this Executive Order. Rather, the invalid provision will be modified to the extent necessary so that it is enforceable.

Signed on November 18, 2020.

**Tim Walz**
Governor

Filed According to Law:

_____

**Steve Simon**
Secretary of State

Approved by the Executive Council on November 19, 2020:

_____

**Alice Roberts-Davis**
Secretary, Executive Council

Filed on November 19, 2020
Office of the Minnesota
Secretary of State,
Steve Simon

23

Exhibit B





# MN Amateur Sports - Reconnect

November 5, 2020



**Exhibit B**



# Today's Invitees

**State Entities**

- Minnesota Amateur Sports Commission
- Minnesota State High School League
- MN Department of Health
- MN Department of Education
- MN Information & Technology
- MN Assoc. of School Administrators

**USOPC Affiliates**

- Special Olympics MN
- MN Youth Athletic Services (MYAS)
- MN Youth Soccer
- MN Softball
- Minnesota Swimming
- Minnesota Hockey
- USTA Northern
- MN Ultimate
- City of Skate
- Twin Cities Soccer League
- MN USA Wrestling
- MN Weightlifting
- MN Youth Ski League
- USA Volleyball
- USA Track & Field

- Minnesota Twins
- MN Cycling
- MNUFC

**Local Groups, Associations, Leagues, & Facilities**

- MIAMA
- YMCA North
- Autism Society of Minnesota
- National Sports Center
- Norden Strategies
- St. Paul Figure Skating Club
- Metro Baseball League
- AKA Sports
- ISD 196
- North Shore Gymnastics
- MPRB

- St. Paul Parks & Rec
- Kokoro Volleyball
- Homegrown Lacrosse
- Minnesota Recreation and Park Association
- North High School
- City of Mankato
- League of Minnesota Cities
- Club 43 Volleyball/Basketball
- St. Paul Public Schools

 **MINNESOTA** AMATEUR SPORTS COMMISSION

# Today's Agenda

1. Welcome
2. Message from Commissioner Tomes
3. Message from the Minnesota Amateur Sports Commission
4. Youth sports and Community Education facilities
5. MDH Decision Tree - What to do if I have a case on my team? What to do about an exposure?
6. MN Statues that require reporting COVID cases
7. CDC recommendation on household exposures
8. Statewide Snapshot (COVID rates by region)
9. Discussion – How we can get better buy-in/broader reach on our guidelines and policies?



# Message from Commissioner Tomes



https://www.health.state.mn.us/diseases/coronavirus/schools/exguide.pdf

 **MINNESOTA**
AMATEUR SPORTS COMMISSION

# Why 14 Days?

- Kris Ehresmann, the health department's director of infectious disease epidemiology, said, "The point of the test is to identify positives quickly. But the incubation period for COVID is 14 days. If you test negative at two to three days, there are 11 to 12 days left in the incubation period in which you could develop illness. That is why a negative test doesn't release you from quarantine."

- Schultz added that "close contact" of 15 minutes within 6 feet also is standard for gauging COVID exposure. He added that "determining the amount of contact is difficult" in fast-moving sports situations where player interaction and activity level (including breathing) might vary.

- **For sports, the MDH recommendation is that if an individual with a lab-confirmed positive participates in a practice while infectious (48 hours prior to becoming symptomatic) the whole team should be treated as "exposed" and self-isolate for 14 days from last contact.**

 **MINNESOTA** AMATEUR SPORTS COMMISSION

# COVID-19 REPORTING

- The communicable disease requires reporting under Minnesota Statutes allows requires "other persons" to report under Minnesota Rules, Chapter 4605.7070. It specifically says:

**4605.7070 OTHER REPORTS.**

- It shall be the duty of any person in charge of any institution, school, childcare facility or camp, or any other person having knowledge of any disease which may threaten the public health, to report immediately the name and address of any person or deceased person suspected of having the disease to the commissioner.

 **MINNESOTA** AMATEUR SPORTS COMMISSION

COVID is also a reportable disease under 4605.7080.

**NEW DISEASES AND SYNDROMES; REPORTING AND SUBMISSIONS.**

**Subpart 1.**

**Disease selection.**

The commissioner shall, by public notice, require reporting of newly recognized or emerging diseases and syndromes suspected to be of infectious origin or previously controlled or eradicated infectious diseases if:

**A.**

the disease or syndrome can cause serious morbidity or mortality; and

**B.**

report of the disease or syndrome is necessary to monitor, prevent, or control the disease or syndrome to protect public health.

If the association has questions, they should speak with their attorney.

 **CDC - Who Needs to Quarantine?**

- **People who have been in close contact with someone who has COVID-19—excluding people who have had COVID-19 within the past 3 months.**
- People who have tested positive for COVID-19 do not need to quarantine or get tested again for up to 3 months as long as they do not develop symptoms again. People who develop symptoms again within 3 months of their first bout of COVID-19 may need to be tested again if there is no other cause identified for their symptoms.
- **What counts as close contact?**
- You were within 6 feet of someone who has COVID-19 for a total of 15 minutes or more
- You provided care at home to someone who is sick with COVID-19
- You had direct physical contact with the person (hugged or kissed them)
- You shared eating or drinking utensils
- They sneezed, coughed, or somehow got respiratory droplets on you



# Household Exposures

**When to start and end quarantine when exposed to a lab-confirmed case of COVID-19**

https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/quarantine.html

**Scenario 1:** Close contact with someone who has COVID-19—will not have further close contact

Your last day of quarantine is 14 days from the date you LAST had close contact.

**Scenario 2: Close contact with someone who has COVID-19—live with the person but can avoid further close contact**

Your last day of quarantine is 14 days from when the person with COVID-19 began home isolation

 **MINNESOTA** AMATEUR SPORTS COMMISSION

# Household Exposures Continued

**Scenario 3. Under quarantine and had additional close contact with someone who has COVID-19**

You will have to restart your quarantine from the last day you had close contact with anyone in your house who has COVID-19. **Any time a new household member gets sick with COVID-19 and you had close contact, you will need to restart your quarantine.**

Date of additional close contact with person who has COVID-19 + 14 days = end of quarantine

**Scenario 4: Live with someone who has COVID-19 and cannot avoid continued close contact**

You should avoid contact with others outside the home while the person is sick, and quarantine for 14 days after the person who has COVID-19 meets the criteria to end home isolation.

Date the person with COVID-19 ends home isolation + 14 days = end of quarantine

**Visit CDC website for calendar visualization of each scenario -** https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/quarantine.html



# Cases are on the Rise Across in all Regions



**New MN COVID-19 cases per capita by region**

Based solely on cases confirmed by the MN Department of Health.
Line represents average of seven prior days of data.



Q&A

**Quarantine inconsistencies** – We have had some questions come in about inconsistencies in different areas of the state of quarantine recommendations from the Department of Health, or local county health departments. As an example, some teams wondering why they have to quarantine after playing an opponent who tested positive, and then in other areas of the state, that was not required.

- We're aware of the various quarantine inconsistencies.  There is no overall quarantine authority that weighs in on every situation which is what makes this challenging.  Sometimes clubs might get quarantine recommendations from us, some might get it from their local public health, some may decide on their own without consulting with public health.  And to further complicate things, exposures can be interpreted in different ways, or facts may change about an exposure, leading to different quarantine guidance.

**Mask refusal** – How are facilities or organizations handling those who refuse to wear a mask? Some cite allergies or medical conditions for their reason not to be able to wear one. Can a doctor's note be required?

- When we've asked our MDH attorneys about this issue, they tell us that there are some suggestions in the face covering executive order, and to refer people to the executive order, and a rink or club should also consult with their attorney for legal interpretation of the executive order

 **MINNESOTA**
AMATEUR SPORTS COMMISSION

Q&A

**11/5/2020 Snapshot**

**Rampant spread**

- 3,956 cases – new high number; 25 deaths
- Third consecutive day of record new cases
- 900+ people are hospitalized
- 200+ are in the ICU
- We're at 98% ICU capacity in the metro



**MINNESOTA**
AMATEUR SPORTS COMMISSION

Q&A

## COVID-19 Sports-Related Cases

### Case and Outbreak Summary, Cumulative since June 1, 2020

| | | |
|---|---|---|
| ▪ **Confirmed COVID-19 Cases with Sports Activities Listed** | Total cases, specimen collection dates from June 1 – Oct 24 | **4781 (+728)[a]** |
| ▪ **Residence at time of reporting** | ▪ Metro:<br>▪ Greater MN: | 2487<br>2294 |
| ▪ **Gender** | ▪ Female:<br>▪ Male:<br>▪ Unknown: | 2016<br>2746<br>19 |
| ▪ **Age** | ▪ Median | 22 years |
| | ▪ Range | 1 – 95 years |
| |   ▪ 0-4 years | 34 |
| |   ▪ 5-10 years (approx. grds K-5) | 282 |
| |   ▪ 11-13 years (approx. grds 6-8) | 361 |
| |   ▪ 14-18 years (approx. grds 9-12)[b] | 1217 |
| |     ▪ 1064 cases since August 1st | |
| |   ▪ 19-24 years | 630 |
| |   ▪ 25-34 years | 455 |
| |   ▪ 35-44 years | 676 |
| |   ▪ 45-54 years | 571 |
| |   ▪ 55-64 years | 312 |
| |   ▪ 65+ years | 243 |
| ▪ **Symptoms present or not for these cases:** | ▪ Symptomatic:<br>▪ Asymptomatic:<br>▪ Unknown: | 4085<br>639<br>57 |





| Suspected and Confirmed Sports Outbreaks Identified through week ending October 24, 2020 | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Sport | Elementary School Based | Middle School Based | High School Based | Adult | Mixed ages & settings | Total |
| Baseball | 0 | 1 | 1 | 3 | 0 | 5 |
| Basketball | 0 | 0 | 12 (+1) | 2 (+3) | 0 | 18 |
| Cheer | 0 | 0 | 1 | 0 | 0 | 1 |
| Cross Country | 0 | 0 | 2 | 1 | 0 | 3 |
| Dance | 1 | 0 | 3 | 1 | 1 | 6 |
| Football | 0 | 2 | 8 (+6) | 7 | 0 | 23 |
| Golf | 0 | 0 | 0 | +3 | 0 | 3 |
| Gymnastics | 0 | 1 | 0 | 0 | 0 | 1 |
| Hockey | 0 | 0 | 8 (+4) | 5 | 1 (+4) | 26 |
| Lacrosse | 0 | 0 | 1 | 0 | 0 | 1 |
| Multiple | 0 | 0 | 1 | 0 | 0 | 1 |
| Soccer | 0 | 0 | 9 | 2 (+1) | 0 | 12 |
| Swimming | 0 | 0 | 0 | 1 | 0 | 1 |
| Tennis | 0 | 0 | 1 | 0 | 0 | 1 |
| Track & Field | 0 | 0 | 0 | 1 | 0 | 1 |
| Volleyball | 0 | +1 | 11 (+7) | 1 | 0 | 20 |
| Weight Training | 0 | 0 | 3 | 0 | 0 | 3 |
| Wrestling | 0 | 0 | 0 | 2 | 0 | 2 |



# Questions, Comments, Discussion

Exhibit C

# COVID-19 in Wisconsin High School Athletics: Study Summary

## *BACKGROUND*

COVID-19 has had an unprecedented impact on virtually every aspect of our lives.  We recognize that the cancelation of school and sports has had profound negative impacts on the physical and mental health of adolescent athletes, but there is little information regarding the risk of contracting COVID-19 through sport participation. In an attempt to provide some initial information to inform ongoing discussions around youth sports, ***we collaborated with the Wisconsin Intercollegiate Athletic Association (WIAA) to collect data regarding the incidence of COVID-19 among high school athletes and the procedures being utilized by high schools to reduce the spread of COVID-19***.

In May of 2020, we conducted a nationwide survey of over 13,000 adolescent athletes regarding the impacts of school and sport cancelation due to COVID-19 on physical activity and mental health.  Comparing the data from 3,200 Wisconsin athletes within this sample to data we had collected from over 5,000 Wisconsin adolescent athletes prior to COVID-19, we found that physical activity levels had dropped by 50% during the pandemic, and symptoms of depression had increased dramatically. Prior to 2020, less than 10% of Wisconsin athletes reported moderate to severe symptoms of depression. Following the widespread cancelation of school and spring sports due to COVID-19, this number had risen to 33%.  In the full nationwide sample, 38% of adolescent athletes reported moderate to severe depression and 35% reported moderate to severe anxiety. (The full study results are available here.)

Nonetheless, we acknowledge that COVID-19 is a dangerous disease that continues to spread throughout the country.  It remains unclear, however, whether sport participation with risk mitigation procedures in place increases the risk of children contracting COVID-19 and potentially passing the virus on to other individuals. Together with the WIAA, we distributed a survey to all of the high schools in Wisconsin regarding sport reinitiation, COVID-19 cases, and risk reduction procedures being utilized during fall of 2020.  ***The information presented here is intended to contribute to ongoing discussions and add to the growing body of evidence regarding the risk of COVID-19 within youth sports.***

## *MAJOR FINDINGS*

Surveys were completed by 207 schools that had restarted sports, representing **over 30,000 student-athletes, over 16,000 practices and over 4,000 competitive games in September 2020.**

- 271 cases of COVID-19 were reported among student-athletes. No cases resulted in hospitalization or death.
- This represents lower case and incidence rates than 14-17 year olds in Wisconsin from 9/6/2020 to 10/3/2020:

|  | WI High School Athletes | WI 14-17 Year Olds[a] |
|---|---|---|
| Total Cases | 271 | 2318 |
| Total Population | 30074 | 223936 |
| Total Person-Days[b] | 846705 | 6270198 |
| *Case Rate (cases per 100,000 children)* | *901* | *1035* |
| *Incidence Rate (cases per person-day)[c]* | *0.000320* | *0.000370* |

[a]Data accessed 10/20/20 at https://www.dhs.wisconsin.gov/covid-19/cases.htm#youth. [b]Person-days represents the total number of days all individuals participated during the study period. [c]Incidence rate ratio 0.86 [95% CI: 0.58-1.3], p=0.59.

**Exhibit C**

COVID-19 cases and incidence were determined for the fall sports in which 50 or more schools reported participation.

- No sports were found to have a higher incidence rate of COVID-19 than 14-17 year olds in Wisconsin from 9/6/2020 to 10/3/2020:

|  | Schools | Players | Cases | Person-Days | Case Rate[a] | Incidence Rate[b] | IRR [95%CI][c] | p[c] |
|---|---|---|---|---|---|---|---|---|
| Cheer/Dance | 73 | 1337 | 19 | 49520 | 1420 | 0.000384 | 1.05 [0.64-1.60] | 0.87 |
| Cross Country | 186 | 4708 | 41 | 182293 | 871 | 0.000225 | 0.61 [0.44-0.82] | 0.001 |
| Football | 162 | 8228 | 86 | 187881 | 1050 | 0.000458 | 1.24 [0.99-1.50] | 0.051 |
| Golf - Girls | 68 | 831 | 7 | 33819 | 842 | 0.000207 | 0.57 [0.24-1.10] | 0.12 |
| Soccer - Boys | 103 | 3147 | 27 | 72494 | 858 | 0.000372 | 1.01 [0.67-1.50] | 0.97 |
| Swimming | 62 | 1202 | 15 | 44411 | 1250 | 0.000338 | 0.93[0.53-1.50] | 0.73 |
| Tennis - Girls | 78 | 2138 | 13 | 84611 | 608 | 0.000154 | 0.42 [0.23-0.69] | 0.001 |
| Volleyball - Girls | 179 | 7454 | 59 | 170211 | 792 | 0.000347 | 0.94 [0.72-1.20] | 0.63 |

[a]Cases per 100,000 players. [b]Cases per person-day, in which person-days represents the total number of days all individuals participated during the study period.. [c]Incidence rate ratio [95% Confidence Interval] and significance level for comparison to COVID-19 incidence among 14-17 year olds in Wisconsin from 9/6/2020 to 10/3/2020; IRR >1 indicates increased COVID-19 incidence rate relative to WI 14-17 year olds, while IRR<1 indicates lower incidence rate. Data accessed 10/20/20 at https://www.dhs.wisconsin.gov/covid-19/cases.htm#youth.

Schools were asked to report the source of the transmission of any positive cases, if known.

- Of the 209 cases among players with a known source, only 1 (<0.5%) was attributed to participation in sports:

| Source | Number (%) |
|---|---|
| Household Contact | 115 (55.0%) |
| School Contact (not sport) | 5 (2.4%) |
| Community Contact (not sport or school) | 85 (40.7%) |
| *Sport Contact* | *1 (0.5%)* |
| Other Contact | 3 (1.4%) |
| Unknown | 62 (29.7%) |

Schools were asked if classes were being conducted in-person or virtually during the study period.

- The incidence of COVID-19 among athletes did not differ between schools with virtual versus in-person instruction:

|  | In-Person | Virtual |
|---|---|---|
| Number of Schools[a] | 182 | 16 |
| Total Cases | 243 | 25 |
| Total Population | 26342 | 2523 |
| Total Person-Days[b] | 774726 | 71979 |
| *Cases Rate (cases per 100,000 Student-Athletes)* | *922* | *991* |
| *Incidence Rate (cases per player-day)[c]* | *0.000314* | *0.000347* |

[a]Nine schools did not respond regarding in-person versus virtual school instruction. [b]Person-days represents the total number of days all individuals participated during the study period. [c]Incidence rate ratio 0.86 [95% CI: 0.58-1.3], p=0.59.

Schools were asked about the presence of a formal plan regarding COVID-19 and risk mitigation procedures.

- 100% of the schools reported that they had a formal plan in place regarding COVID-19 risk reduction. The median number of procedures utilized was 8 per school. The number and proportion of schools reporting the use of specific procedures:

| Risk mitigation procedure | Number of Schools (%) |
| --- | --- |
| Player/staff symptom monitoring | 186 (89.9%) |
| Player/staff temperature checks at home | 137 (66.2%) |
| Player/staff temperature checks on site | 86 (41.5%) |
| Face mask use for players off the field | 176 (85.0%) |
| Face mask use for staff | 203 (98.1%) |
| Social distancing for players off the field | 171 (82.6%) |
| Social distancing for staff | 176 (85.0%) |
| Increased facility disinfection | 195 (94.2%) |
| Staggered arrival and departure times for events | 91 (44.0%) |
| Face mask use for players while playing | 173 (83.6%) |
| Social distancing for players while playing | 89 (43.0%) |

## CONCLUSIONS

These findings suggest that participation in sports is not associated with an increased risk of COVID-19 among Wisconsin high school student-athletes.  The total case rate and incidence rate reported by this statewide sample representing over 30,000 student-athletes are lower than those reported by the Wisconsin Department of Health Services for 14-17 year olds during the same time period.  In fact, no specific sport had a statistically higher incidence rate than the background incidence among adolescents across the state during the same time period.  Furthermore, while the number of schools utilizing virtual instruction was small, we identified no difference in COVID-19 incidence between student-athletes from schools with in-person versus virtual instruction.

In addition, these findings agree with the existing literature regarding COVID-19 severity in children, as none of the cases were reported to result in hospitalization or death.  Although 30% of the reported cases did not have an identified source, only 1 (<0.5%) of the cases with a reported source was attributed to transmission during sports activities.  Finally, all of the respondent high schools reported having a formal COVID-19 plan in place, and the majority reported utilizing a broad range of risk mitigation procedures.

While we hope that this information will help contribute to the ongoing discussions about the relative risks and benefits of youth sport participation, we should recognize that COVID-19 risk will vary in different areas of the country and across age groups.  Therefore, efforts to assess COVID-19 risk among youth athletes should be expanded and replicated in other populations in order to provide a more complete picture of the risk of COVID-19 transmission during sport participation.

Exhibit D





**Exhibit A**



Lower Mall Center near WWII Memorial



Lower Mall East View 1



Lower Mall East View 2



Lower Mall East View 3



Lower Mall East View 4



Lower Mall view from Rotunda



Lower Mall West View



Upper Mall  Center View

**Exhibit D**







Upper Mall East View



Upper Mall East View



Aurora Promenade top of steps



Aurora Promenade East View