**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| LET THEM PLAY MN, JANE DOE 1, *individually and as parent and guardian of Jane Doe 2 and John Roe 1, minors*, JANE DOE 3, *as parent and guardian of John Roe 2 and Jane Doe 4, minors*, JANE DOE 5, and JOHN ROE 3, *as parent and guardian of John Roe 4, a minor*, | Civil No.  20-2505 (JRT/HB) |
| Plaintiffs, | |
| v. | |
| GOVERNOR TIM WALZ, *in his official capacity*, ATTORNEY GENERAL KEITH ELLISON, *in his official capacity*, COMMISSIONER JAN MALCOLM, *in her official capacity*, MINNESOTA DEPARTMENT OF HEALTH, COMMISSIONER ALICE ROBERTS-DAVIS, *in her official capacity*, and MINNESOTA DEPARTMENT OF ADMINISTRATION, | **MEMORANDUM OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND FOR EXPEDITED DISCOVERY** |
| Defendants. | |

Samuel W. Diehl and Ryan Wilson, **CROSSCASTLE PA**, 17118 64th Avenue North, Maple Grove, MN 55311, for plaintiffs.

Elizabeth C. Kramer and Cicely R. Miltich, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 1100, Saint Paul, MN 55101, for defendants.

Plaintiffs have alleged that Governor Walz's prohibitions on social gatherings and youth sports in Minnesota Executive Order 20-99 ("EO 20-99") violate the First and

Fourteenth Amendments of the United States Constitution and Article I of the Minnesota Constitution.  Plaintiffs now seek a Preliminary Injunction and Expedited Discovery, arguing that EO 20-99 prevents them from protesting at the State Capitol, thus violating their First Amendment rights of free speech and assembly.  Plaintiffs ask the Court to enjoin Defendants from enforcing EO 20-99's prohibition on social gatherings, and for expedited discovery in anticipation of bringing another motion in the future to enjoin Defendants from enforcing EO 20-99's prohibition on youth sports.  Because Plaintiffs fail to demonstrate that preliminary injunctive relief is warranted, and because Plaintiffs fail to establish good cause for expedited discovery, the Court will deny Plaintiffs' Motion.

## BACKGROUND

### I.  FACTUAL BACKGROUND

Plaintiffs consist of parents, their children, coaches, and Let Them Play MN, a non-profit group consisting of more than 23,000 people, all of whom believe it is unfair to prohibit youth sports during the COVID-19 pandemic.  (*See* Compl. ¶¶ 5, 7–24, Dec. 10, 2020, Docket No. 1.)

On November 17, 2020, suspecting that an executive order was forthcoming, one which would prohibit youth sports, Plaintiffs decided to organize a protest on the grounds of the State Capitol.  (Decl. of Ryan D. Wilson ("Wilson Decl.") ¶ 2, Dec. 12, 2020, Docket No. 11.).  The Minnesota Department of Administration ("MDA") instructed them to apply online for a permit.  (*Id.*)

Plaintiffs applied on November 18, 2020, but then retracted their application the same day.  (Decl. of Anne Johnson ¶¶ 4–5, Dec. 15, 2020, Docket No. 21; *id.* ¶ 4, Ex. 1, Dec. 15, 2020, Docket No. 21-1.)  Plaintiffs also submitted thirteen record requests to the Minnesota Department of Health ("MDH") that day, which asked for any documents and data that Defendants might have relied on when deciding to prohibit youth sports.. (Wilson Decl. ¶ 10; *see also id.*, Ex. G, Dec. 12, 2020, Docket No. 11.)  MDH acknowledged receipt of the record requests, but has not yet provided any documents or data.  (Wilson Decl. ¶ 10.)

Later that day, November 18, 2020, Governor Walz issued EO 20-99, proclaiming that "the current average rate of new COVID-19 cases, hospitalizations and intensive care unit admissions, and deaths are the highest that they have been since the start of the pandemic, far exceeding the numbers we saw in the worst points of our surges in April and May."  (Compl. ¶ 49, Ex. A ("Executive Order") at 37, Dec. 10, 2020, Docket No. 1.) EO 20-99 further notes that, based on the test positivity rate and the number of new COVID-19 cases, the coronavirus is everywhere, thus making it necessary to dial back on in-person social activity and impose restrictions on certain businesses.  (Executive Order at 37–38.)

Specifically, EO 20-99 states that MDH confirmed over thirty outbreaks associated with "gatherings, bars, and restaurants" over a one-week period.  (*Id.* at 38.)  EO 20-99 also states that there had been 192 outbreaks connected to sports, and that sports-

related cases were twice as prevalent among high school-age children as any other age group, which plays a key role in the need to move schools to distance learning.  (*Id.*)  EO 20-99 notes, as well, that MDH case numbers demonstrate that there are "relatively fewer outbreaks in retail settings, which generally involve brief, masked, transient interactions that pose lower transmission risk," as such interactions do not involve "close contact," defined as being within six feet of someone for fifteen or more minutes.  (*Id.* at 39.)

Based on these findings, EO 20-99 then imposes a range of restrictions, including a prohibition on "social gatherings," which are defined as "groups of individuals, who are not members of the same household, congregated together for a common or coordinated social, community, or leisure purpose—even if social distancing can be maintained.  This prohibition includes indoor and outdoor gatherings, planned and spontaneous gatherings, and public and private gatherings."  (*Id.* at 41.)  Certain types of social gatherings, such as religious services and drive-in gatherings, are limited by EO 20-99, but not prohibited.  (*See, e.g.*, *id.* at 43–44.).

The prohibition on "social gatherings" does not apply to "activity by workers or customers of businesses permitted to remain open under this Executive Order, providing that those businesses follow the requirements and limitations set forth in this Executive Order."  (*Id.* at 41.)  These requirements and limitations include having a COVID-19

preparedness plan, working from home when possible, social distancing procedures, hygiene control, and disinfection protocols.  (*Id.* at 51.)

The prohibition on "social gatherings" also does not apply to "persons in Places of Public Accommodation that are permitted to be open to members of the public under this Executive Order, provided that [they] follow the requirements and limitations set forth in this Executive Order."  (*Id.* at 41.)  "Places of Public Accommodation" are subject to various requirements and limitations, ranging from being entirely closed to the public, to limited occupancy, to the requirements that all businesses must follow.  (*Id.* at 47–51.)

Under EO 20-99, all in-person Organized Youth Sports activities are prohibited, except those whose primary purpose is to provide childcare or physical education in school.  (*Id.* at 54.)  Participation in outdoor recreational activities or sports is also allowed for individuals from the same household.  (*Id.* at 55.)

The portions of EO 20-99 related to social gatherings and youth sports are effective from November 20 through December 18, 2020.  (*Id.* at 40.)  Organizers of prohibited social gatherings who willfully violate EO 20-99 may be guilty of a misdemeanor and, upon conviction, must be punished by a fine not to exceed $1,000 or by imprisonment for not more than 90 days.  (*Id.* at 41, 58.)

On November 19, 2020, and after EO 20-99 issued, Plaintiffs emailed MDA about holding a protest at the Capitol, on either November 28 or December 12, 2020, for roughly 300 attendees.  (Wilson Decl. ¶ 5; *id.*, Ex. E at 2, Dec. 12, 2020, Docket No. 11.)  MDA

responded, stating that the Capitol was not available for events or gatherings through December 18, 2020, per EO 20-99.  (Wilson Decl. ¶ 5, Ex. E at 2.)

As of December 14, 2020, the Centers for Disease Control and Prevention had identified 16,113,148 total cases of COVID-19 and 298,266 deaths in the United States.  (Decl. of Liz Kramer ¶ 8, Dec. 15, 2020, Docket No. 20.)  Additionally, as of the same date, MDH reported that 381,841 Minnesotans had tested positive for COVID-19 and 4,462 had died from the disease, with the highest number of COVID-19 deaths reported on a single day, 101, occurring on November 27, 2020.  (*Id.* ¶¶ 6–7.)

## II.    PROCEDURAL BACKGROUND

Plaintiffs filed their Complaint on December 10, 2020, alleging three Counts: (1) violation of Plaintiffs' First Amendment rights of speech and assembly; (2) denial of equal protection and due process in violation of the Fourteenth Amendment; and (3) denial of equal protection and due process in violation of the Minnesota Constitution.  (Compl. ¶¶ 108–38.)

On December 12, 2020, Plaintiffs filed a Motion for Preliminary Injunction and for Expedited Discovery, asking the Court to enjoin Defendants from enforcing EO 20-99 with respect to prohibiting speech, expressive conduct, or expressive assembly, and to allow Plaintiffs to serve four document requests and conduct a four-hour deposition.  (Mot. Prelim. Inj. & Expedited Disc., Dec. 12, 2020, Docket No. 9.)  Defendants oppose the Motion, arguing that (1) Plaintiffs lack standing, (2) any case or controversy is moot

because EO 20-99 is set to expire on December 18, 2020, (3) Plaintiffs fail to demonstrate that injunctive relief is warranted, and (4) Plaintiffs fail to demonstrate good cause for expedited discovery.  (Defs.' Mem. Opp. at 2–3, Dec. 15, 2020, Docket No. 19.)

## DISCUSSION

### I.  PRELIMINARY INJUNCTION

#### A.  Standing

##### 1.  Standard of Review

"Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy" and consists of three elements: an injury in fact, that is fairly traceable to the challenged conduct of the defendant, and that is likely to be redressed by a favorable judicial decision.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citations omitted).  This case concerns the injury-in-fact requirement.

"To establish injury in fact for a First Amendment challenge to a state [law], a plaintiff needs only to establish that he would like to engage in arguably protected speech, but that he is chilled from doing so by the existence of the [law]."  *281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011) (quotation omitted).  An injury in fact must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up).  However, "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is 'a substantial risk' that the harm will occur."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149,

158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)); *see also*
*O'Shea v. Littleton*, 414 U.S. 488, 496 (1974) ("[P]ast wrongs are evidence bearing on
whether there is a real and immediate threat of repeated injury.").

### 2. Analysis

Defendants assert that Plaintiffs have suffered no injury in fact, for they withdrew
their initial application to protest at the Capitol, and the two dates that Plaintiffs
subsequently requested, but which were denied per EO 20-99, have passed. Defendants
further contend that Plaintiffs have not submitted additional applications to protest, so
there is no risk of future injury.

With respect to the dates on which Plaintiffs sought to protest at the Capitol, which
have now passed, it is true that an injunction "is inherently prospective and cannot
redress past injuries." *Frost v. Sioux City, Iowa*, 920 F.3d 1158, 1161 (8th Cir. 2019).
However, presently and until EO 20-99 expires at midnight on December 19, 2020, all
gatherings at the Capitol are prohibited.[1]

As a result, Plaintiffs will continue to be unable to assemble and protest at the
Capitol, as further applications to gather there will continue to be denied, per EO 20-99.

---

[1] The Court recognizes that after the hearing on Plaintiffs' Motion, Governor Walz signed
Executive Order 20-103 ("EO 20-103"), which modifies EO 20-99's provisions with respect to both
social gatherings and youth sports, and which may possibly affect Plaintiffs' ability to protest at
the Capitol in the future. However, EO 20-103 does not take effect until December 19, 2020,
which will be after the Court issues its decision, so any possible changes effected by EO 20-103
are irrelevant to the Court's consideration of the issues presently in dispute. Counsel have not
filed any position with respect to the new Executive Order.

As such, the Court finds that there is a substantial risk that the harm alleged to have already occurred will be repeated in the future.  Accordingly, the Court finds that Plaintiffs have standing to petition the Court for injunctive relief with respect to Defendants' enforcement of EO 20-99.

### B.  Mootness

#### 1.  Standard of Review

When a law has expired by its own terms, then a live case or controversy is likely lacking, thus obviating the need to reach the merits of a claim.  *See Burke v. Barnes*, 479 U.S. 361, 363 (1987).  "No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quotation omitted).

#### 2.  Analysis

Defendants assert that Plaintiffs' First Amendment challenge to EO 20-99 will soon be moot, as EO 20-99 expires on December 18, 2020.  However, albeit soon, EO 20-99 has not expired yet, and mootness is not determined by a probable expiration or modification of the law.  Thus, the alleged unlawfulness of Defendants' conduct, which precipitated Plaintiffs' lawsuit, is still in in dispute.  Further, the Court could still provide effectual relief with respect to the legal rights that Plaintiffs allege were violated, which demonstrates that the controversy is still live.   Therefore, the Court finds that Plaintiffs' First

Amendment claim at this time is not moot and, accordingly, it will consider the question of whether preliminary injunctive relief is warranted.

### C. Preliminary Injunctive Relief

#### 1. Standard of Review

When considering whether to grant preliminary injunctive relief, courts weigh four factors, commonly referred to in the Eighth Circuit as the *Dataphase* factors: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm injunctive relief would cause to the other litigants; and (4) the public interest. *Rodgers v. Bryant*, 942 F.3d 451, 455 (8th Cir. 2019) (citing *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)).

When applying these factors, "a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999) (quotation omitted). That said, "a preliminary injunction is an extraordinary remedy and the burden of establishing the propriety of an injunction is on the movant." *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011).

2. **Analysis**

a. **Likelihood of Success on the Merits**

Plaintiffs must show that they have a "fair chance of prevailing" on the merits of at least one its claims to satisfy the "likelihood of success on the merits" factor.  *See Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016) (quotation omitted).  A "fair chance" is less than a preponderance of the evidence (i.e. greater than fifty percent chance of success), but more than an outside chance of success.  *See Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003).

Here, there is one underlying claim: that EO 20-99 violates Plaintiffs' First Amendment rights to free speech and assembly.  *See Thomas v. Collins*, 323 U.S. 516, 530 (1945) ("[T]he rights to freedom in speech and press were coupled in a single guaranty with the rights of the people peaceably to assemble and to petition for redress of grievances.  All these, though not identical, are inseparable."); *see also Hoffmann v. Mayor, Councilmen & Citizens of Liberty*, 905 F.2d 229, 233 (8th Cir. 1990).

As a preliminary manner, Plaintiffs suggest that EO 20-99 operates as a content-based restriction, thus meriting strict scrutiny.  This assertion is based on the fact that EO 20-99 prohibits "social gatherings," which by definition, does not include various forms of

consumer activity.  As such, Plaintiffs contend that EO 20-99 privileges commercial speech over the type of protest speech Plaintiffs intend.[2]

The Court finds Plaintiffs' argument unavailing.  While it is certainly "possible to find some kernel of expression in almost every activity a person undertakes . . . such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *Dallas v. Stanglin*, 490 U.S. 19, 25 (1989).  Instead, the relevant question is "whether the government has adopted a regulation of speech because of disagreement with the message it conveys."  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

The Court finds that EO 20-99's prohibition on social gatherings has nothing to do with any message that might be conveyed at such gatherings.  Rather, the prohibition has the singular intent of curbing the spread of COVID-19.  As such, EO 20-99 is neutral on its face and is thus a content-neutral regulation.  *Id.* ("[A] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental

---

[2] Plaintiffs largely rely on a recent Supreme Court opinion, *Roman Catholic Diocese of Brooklyn v. Cuomo*, No. 20A87, 2020 WL 6948354 (U.S. Nov. 25, 2020), to support their argument.  However, *Cuomo* involved a Free Exercise Clause challenge and an executive order that violated the minimum-neutrality requirement of this Clause, as it singled out houses of worship for disparate treatment.  *See Cuomo*, 2020 WL 6948354, at *1–2.  Conversely, here, EO 20-99 in no way correlates, nor is it hostile, to religion and is thus distinguishable.  *Accord Commonwealth v. Beshear*, No. 20-6341, 2020 WL 7017858, at *3 (6th Cir. Nov. 29, 2020).  In fact, EO 20-99 treats religious gatherings more favorably that social gatherings, as the former are limited whereas the latter are entirely prohibited.  Furthermore, the Court finds that the Free Exercise Clause line of cases considered by the Supreme Court during the pandemic present factual circumstances distinct from those surrounding Plaintiffs' free speech and assembly claim.  *Accord Ramsek v. Beshear*, 468 F. Supp. 3d 904, 912 (E.D. Ky. 2020).

effect on some speakers or messages but not others."); *Phelps-Roper v. City of Manchester*, 697 F.3d 678, 689 (8th Cir. 2012).

Content-neutral regulations are generally subject to intermediate scrutiny. *See City of Manchester*, 697 F.3d at 686. However, the public health crisis brought on by the COVID-19 pandemic has led courts to question whether the two-part test announced in *Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905), applies instead.

In April 2020, the Eighth Circuit held that a district court "abused its discretion" by **not** applying the *Jacobson* test when considering whether an executive order issued in response to the pandemic violated a constitutional right, which "produced a patently erroneous result." *In re Rutledge*, 956 F.3d 1018, 1028 (8th Cir. 2020); *see also Lewis v. Walz*, No. 20-1212, 2020 WL 5820549, at *4 n.5 (D. Minn. Sept. 30, 2020) (noting that other district courts have refused to apply the *Jacobson* test but that others, including the Eighth Circuit, have relied on it).

However, in late November 2020, the Supreme Court suggested that *Jacobson* does not stand for the proposition that courts should deviate from the usual tiered-constitutional standards of review during a pandemic. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, No. 20A87, 2020 WL 6948354, at *5–6 (U.S. Nov. 25, 2020) (Gorsuch, J., concurring).

As such, the question of which standard to apply to a content-neutral regulation in this Circuit during the COVID-19 pandemic—the *Jacobson* test or intermediate scrutiny—

is not entirely clear.  Because the Eighth Circuit has not addressed the question post-*Cuomo*, the Court will evaluate Plaintiffs' free speech and assembly claim under both standards of review.

   i.  ***Jacobson***

*Jacobson* established that "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members" and, while constitutional rights do not disappear during a public health crisis, "the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand."  *In re Rutledge*, 956 F.3d at 1027 (quoting *Jacobson*, 197 U.S. at 27, 29).  As such, *Jacobson* established a two-part test: when faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as (1) the measures have at least some real or substantial relation to the public health crisis and (2) are not beyond all question, a plain, palpable invasion of rights secured by fundamental law.  *Id.* at 1027 (quoting *Jacobson*, 197 U.S. at 31).

With respect to the first prong, EO 20-99 clearly has a real and substantial relation to a public health crisis, as it is only in effect to stem the rising tide of COVID-19 cases and resultant deaths.  Further, EO 20-99 issued in service of protecting and promoting the public's health and safety during the pandemic, which accords with the police power reserved to the states.  Finally, *Jacobson* counsels that courts should rarely encroach upon

states' policy determinations concerning how best to combat public health crises. *See id.* at 1029 (citing *Jacobson*, 197 U.S. at 28). As such, the Court finds that EO 20-99 satisfies the first prong.

With respect to the second prong, EO 20-99 passes muster if it does not violate, "beyond all question," a constitutional right, which would be tantamount to an outright ban on all or virtually all of Plaintiffs' rights to free speech and assembly. *See id.* at 1030. Here, Plaintiffs have not lost all or virtually all of their rights to expressive conduct, for they can still assemble and protest Governor Walz's prohibition on youth sports, whether by way of their robust social media presence, traditional media forms, or even by conducting drive-through protests, none of which have been disallowed by EO 20-99.

Further, as EO 20-99 carries with it an expiration date, it is merely a delay on assembling or speaking at social gatherings, not an outright ban, which also cuts against any finding that EO 20-99 is, "beyond all question," a plain, palpable invasion of rights secured by fundamental law. *Id.*; *accord Lewis*, 2020 WL 5820549, at *5 (holding that plaintiffs did not sufficiently allege that limitations on the size of gatherings were "beyond all question" a "plain, palpable invasion" of rights). As such, the Court finds that EO 20-99 satisfies the second prong as well.

Accordingly, under the two-part *Jacobson* test, the Court finds that Plaintiffs are unlikely to succeed on the merits of their First Amendment claim.

### ii. Intermediate Scrutiny

Under intermediate scrutiny, a content-neutral regulation "must be narrowly tailored to serve a significant governmental interest and allow for ample alternative channels for communication." *City of Manchester*, 697 F.3d at 686 (cleaned up). However, the regulation need not be the least intrusive or least restrictive means of furthering a legitimate governmental interest; rather, "the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 798–99 (cleaned up).  Further, "the First Amendment does not guarantee the right to employ every conceivable method of communication at all times and in all places[.]" *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984).

Here, there is no dispute that EO 20-99 serves a significant government interest. It was issued to protect and promote public health and safety during a surge of COVID-19 cases and deaths unlike any other public health crisis suffered before in Minnesota. Furthermore, as EO 20-99 makes clear, its intent is to stem the rapidly rising influx of COVID-19 cases and deaths.  Therefore, it specifically targets activities that contribute most to the rapid spread of the coronavirus and, thus, prohibits activities involving people in close contact with each other, such as social gatherings during which people congregate and emit viral particles, like Plaintiffs' planned protest, which may have involved over 300 attendees.

Moreover, EO 20-99 does not prohibit all types of gatherings, for it recognizes that more transient encounters, such as some consumer activities, or carefully managed gatherings, such as religious services, do not pose the same risk of rapid spread to devastating effect.  As such, EO 20-99 is careful to target only the riskiest kind of gatherings—namely, unmanaged gatherings involving close contact—thus demonstrating narrow tailoring.[3]  *See Frisby v. Schultz*, 487 U.S. 474, 485 (1988) ("A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy.").  Additionally, EO 20-99 is of limited duration, as it will only be in effect over the course of four weeks, which further narrows its tailoring.  *Accord Givens v. Newsom*, 459 F. Supp. 3d 1302, 1314 (E.D. Cal. 2020) (finding that a temporary moratorium on permits to protest at a state capitol was narrowly tailored).  As such, the Court finds that EO 20-99 is narrowly tailored to serve a significant governmental interest.

The Court also finds that Plaintiffs have ample alternative channels for communication during this current surge of the COVID-19 pandemic.  As mentioned above, Plaintiffs can still critique Governor Walz's prohibition of youth sports online or via the media, and they can carry out drive-through protests as well.

---

[3] To be sure, one could ask whether the government's significant interest might have been adequately achieved with a less stringent restriction—say, social gatherings of fifteen people from a maximum of three households, which appears to be what the law will soon allow.  *See supra* note 1.  However, a content-based regulation is not invalid simply because some less-speech-restrictive alternative might have been available.  *See Ward*, 491 U.S. at 800.

Therefore, under intermediate scrutiny, the Court finds that Plaintiffs are unlikely to succeed on the merits of their First Amendment claim.

### b. Irreparable Harm

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages."  *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).  To succeed in demonstrating a threat of irreparable harm, mere possibility is not sufficient: the moving party "must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief," *Roudachevski*, 648 F.3d at 706 (quotation omitted).

"It is well-established that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015) (cleaned up).  However, when a court concludes that plaintiffs are unlikely to succeed in showing their First Amendment rights have been violated, then such plaintiffs also fails to show a threat of irreparable harm warranting preliminary injunctive relief.  *Id.*; *see also Planned Parenthood Minn., N.D., S.D.*, 530 F.3d 724, 738 n. 11 ("If the movant cannot show that it is likely to prevail on the merits, there is no reason at the preliminary injunction stage for the courts to disturb a [law] to balance the [state's and the public's] interests.").

Here, Plaintiffs have shown that they are unlikely to prevail on the merits of their First Amendment claim.   As such, the Court finds that Plaintiffs have not shown irreparable harm warranting preliminary injunctive relief.

### c.  Balance of the Harms

The balance-of-harms factor involves "assess[ing] the harm the movant would suffer absent an injunction," as well as the harm the nonmovant "would experience if the injunction issued." *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 875 (D. Minn. 2015).  The balance of equities generally favors protecting First Amendment freedoms.  *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) (overruled on other grounds).

Plaintiffs have not demonstrated that they are likely to succeed on the merits of their First Amendment claim, so no First Amendment freedoms need protection here.  On the other hand, Defendants would suffer great harm if they were enjoined from enforcing EO 20-99, for their interest in promoting and protecting public welfare and safety would be significantly stymied.  Accordingly, the Court finds that the balance of the harms favors Defendants.

### d.  Public Interest

The determination of where the public interest lies is likewise dependent on the likelihood of success of a First Amendment challenge, as it is always in the public interest to protect constitutional rights.  *Id.*  Here, with no showing of likely success on the merits of Plaintiffs' claim, the public interest does not lie on their side.  There is, however,

considerable public interest in quelling the rise of COVID-19 deaths and the rampant spread of the coronavirus.  Accordingly, the Court finds that the public interest lies with Defendants.

### 3.  Conclusion

In sum, the Court finds that none of the *Dataphase* factors favor Plaintiffs. Accordingly, the Court will deny Plaintiffs' Motion with respect to their request for preliminary injunctive relief.

## II.  EXPEDITED DISCOVERY

### A.  Standard of Review

"Ordinarily, parties may not seek discovery prior to conferring as required by the Federal Rules of Civil Procedure."  *Nilfisk, Inc. v. Liss*, No. 17-1902, 2017 WL 7370059, at *7 (D. Minn. June 15, 2017).  However, a court may order expedited discovery for good cause, if the party requesting it can demonstrate that "the need for expedited discovery, in consideration of administration of justice, outweighs prejudice to the responding party."  *Id.* (quotation omitted).  Such a scenario may exist when a party demonstrates a need to further develop the record to help the court determine whether preliminary injunctive relief is warranted, *see Midwest Sign & Screen Printing Supply Co. v. Dalpe*, 386 F. Supp. 3d 1037, 1057–58 (D. Minn. 2019), provided the bounds of expedited discovery are reasonable, *see Nilfisk*, 2017 WL 7370059, at *7.

**B. Analysis**

Plaintiffs' Motion asks only for injunctive relief with respect to their First Amendment claim, yet their discovery requests all relate to developing the record with respect to claims arising under the Fourteenth Amendment and the Minnesota Constitution—ones challenging the prohibition on youth sports, not the prohibition on social gatherings.  Further, while Plaintiffs mention that they anticipate filing a second motion for preliminary injunctive relief with respect to the youth sports prohibition, an inchoate motion for preliminary injunction does not demonstrate a present need for expedited discovery. *See ALARIS Grp., Inc. v. Disability Mgmt. Network, Ltd.*, No. 12-446, 2012 WL 13029504, at *3 (D. Minn. May 30, 2012) (collecting cases denying expedited discovery motions when no motion for preliminary injunction was pending).

Additionally, Plaintiffs' requests are hardly narrow, as they ask to depose an MDH representative and request all documents that Defendants relied upon when deciding to prohibit youth sports.  Granting such requests would cause Defendants significant prejudice, as they would be compelled to engage in expansive and costly discovery far in advance of what the Rules contemplate in the absence of exigency. *Compare Council on Am.-Islamic Relations-Minnesota v. Atlas Aegis, LLC*, No. 20-2195, 2020 WL 6336707, at *6 (D. Minn. Oct. 29, 2020) (allowing expedited discovery because the scope of the request was narrow), *with Nilfisk*, 2017 WL 7370059, at *7 (finding that a request by one party to depose the other was unreasonable).

Accordingly, the Court will deny Plaintiffs' Motion with respect to their request for expedited discovery.

## CONCLUSION

In sum, the Court finds that none of the *Dataphase* factors favor Plaintiffs, as they have not demonstrated a likelihood of succeeding on the merits of their First Amendment claim and the remaining factors all fall out of favor for them as a result. Additionally, the Court finds that Plaintiffs have not established good cause for expedited discovery, as they have no pending motion requesting injunctive relief with respect to youth sports and their requests are exceedingly broad. Accordingly, the Court will deny Plaintiffs' Motion for Preliminary Injunction and for Expedited Discovery. Because the Motion does not challenge the temporary prohibition on youth sports, the Court expresses no opinion on the validity of the ban.

The State's temporary restriction on social gatherings that is the subject of this challenge is another grim result of the rapid spread of a dangerous virus that has ravaged Minnesota as it has the United States and much of the world. No one is in favor of limiting cherished constitutional rights, nor should they be. But the State's measured response, focused directly on the likely causes of the recent surge, satisfies judicial scrutiny. It is hoped that the restrictions on public activity will prove successful and brief.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiffs' Motion for Preliminary Injunction and for Expedited Discovery [Docket No. 9] is **DENIED**.  This action is referred to the Magistrate Judge to set an appropriate schedule for discovery.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATED:  December 18, 2020
at Minneapolis, Minnesota.

_____
JOHN R. TUNHEIM
Chief Judge
United States District Court